**GREYHOUND LINES, INC.**

v.

**PETER PAN BUS LINES, INC.**

No. 93–6154.

United States District Court,
E.D. Pennsylvania.

Feb. 23, 1994.

Michael G. Tierce, Schnader, Harrison Segal & Lewis, Philadelphia, PA, for plaintiff.

Howard A. Rosenthal, Pelino & Lentz, P.C., Philadelphia, PA, Jeremy Kahn, Kahn & Kahn, Washington, DC, for defendant.

### MEMORANDUM AND ORDER

ANITA B. BRODY, District Judge.

In this action I must decide whether an injunction should be issued against the defendant Peter Pan Bus Lines for behavior of "hawkers" employed by Peter Pan to announce its services, and conduct by Peter Pan bus drivers. I find that the "hawkers" did commit and should be enjoined from trespass in the Greyhound terminal, but that their activity outside the Greyhound terminal does not constitute a public nuisance. I find that the busdrivers have committed trespass, and that an injunction is appropriate for those violations.

## I. FINDINGS OF FACT

On January 24th and 25th, 1994, I held a hearing for the purpose of determining whether to issue a preliminary injunction, and received testimonial, document, photograph, and videotape evidence. I make the following findings of fact:

1. Plaintiff, Greyhound Lines, Inc., is a Delaware corporation whose principal place of business is located in Dallas, Texas. Greyhound is engaged in the business of transporting passengers by motor vehicle in intrastate and interstate commerce pursuant to Certificates of Public Convenience and Necessity issued by the Interstate Commerce Commission ("ICC") and certain state regulatory authority and has been in business for over 80 years. Stipulation of Parties.

2. Greyhound is authorized to do business in the Commonwealth of Pennsylvania and maintains a facility for this purpose which is located at 1001 Filbert Street, Philadelphia, Pennsylvania ("the Greyhound Terminal"). Stipulation of Parties.

3. Greyhound has conducted business at the Greyhound Terminal since July 1, 1986. Stipulation of Parties.

4. At all times relevant to this action, Martin Pisciotti has been Greyhound's District Manager for the district which includes all Greyhound facilities in Pennsylvania, New Jersey and Delaware. Testimony of Martin Pisciotti.

5. At all times relevant to this action, Greg Burns has been Greyhound's Customer Service Manager at the Greyhound Terminal, with primary responsibility for Greyhound's operations at that facility. Mr. Burns reports to Mr. Pisciotti. Testimony of Greg Burns.

6. At all relevant times, Richard Willis, who is employed by Wachenhut Security, has been in charge of security at the Greyhound Terminal. Mr. Willis, a 24 year veteran of the Philadelphia Police Force, reports to Mr. Burns. Testimony of Richard Willis.

7. Defendant, Peter Pan Bus Lines, Inc., ("Peter Pan") is a Massachusetts corporation whose principal place of business is located in Springfield, Massachusetts. Peter Pan is engaged in the business of transporting passengers by motor vehicle in intrastate and interstate commerce pursuant to Certificates of

Public Convenience and Necessity issued by the ICC and certain state regulatory authority. Stipulation of Parties.

8. Peter Pan is authorized to do business in the Commonwealth of Pennsylvania and maintains a facility for this purpose located at 55 North 11th Street in Philadelphia, Pennsylvania ("the Peter Pan Terminal"). A portion of the Peter Pan Terminal is directly adjacent to the Greyhound Terminals on Filbert Street in Philadelphia. Stipulation of Parties.

9. Peter Pan and Greyhound are competitors on routes between Philadelphia and Washington, D.C. and Philadelphia and New York City. Stipulation of Parties.

10. On or about September 1, 1993, Peter Pan began operating out of the Peter Pan Terminal, on property directly adjoining the property upon which the Greyhound Terminal is located. Stipulation of Parties.

11. David Batchelor, Sr. is Peter Pan's Vice President of Business Development. Testimony of David Batchelor, Sr.

12. David Batchelor, Jr. is the manager of the Peter Pan Terminal and the only Peter Pan managerial employee at that terminal. Testimony of D. Batchelor, Sr.; Answer to First Set of Interrogatories, Number 3. Mr. Batchelor, Jr. did not testify at trial.

13. Peter Pan has hired several former Greyhound employees including David W. Batchelor, Sr., Raphael Cedeno and several bus drivers. Testimony of D. Batchelor, Sr.

14. The main public entrance to the Greyhound Terminal is located on Filbert Street. Testimony of M. Pisciotti. This main public entrance, the doorway to which is 65 inches wide, is the only public entrance to the Greyhound Terminal on Filbert Street. *Id.*

15. Greyhound leases the property upon which the Greyhound Terminal is located ("the Greyhound Property") pursuant to a lease agreement dated December 30, 1986 between Transportation Associates and Eastern Greyhound Lines, Co. (a former affiliate of Greyhound Lines, Inc.). Testimony of M. Pisciotti. Under the terms of the lease agreement, Greyhound has the exclusive right to use and occupy the Greyhound property, and no other party has any right to use, occupy, crossover, or enter upon the Greyhound Property without Greyhound's express consent. The total monthly amount Greyhound pays for the Greyhound property is approximately $23,000. Exhibit P–9.

16. A portion of the Greyhound property, which is located behind the Greyhound Terminal, is immediately adjacent to Cuthbert Street, a public street of the City of Philadelphia. Exhibit P–1.

17. Cuthbert Street in the area of the Greyhound Terminal is a legally open public street from North Eleventh Street eastwardly to the western boundary of the Greyhound Property where Cuthbert Street dead-ends and is posted by the City of Philadelphia as having "No Access" from North Eleventh Street. There are also several signs in this area (posted by the City of Philadelphia) indicating that there is "No Stopping" and "No Parking" in the area. Exhibits P–7a through P–7d. The 1000 block of Cuthbert Street is not a through street and does not connect North Eleventh Street and North Tenth Street. Exhibit P–1.

18. On the portion of Cuthbert Street which is open to the public, "Stopping" is prohibited at the western most end up to North Eleventh Street. In the rest of the public portion of Cuthbert Street only "Parking" is prohibited. Exhibit P–7d.

19. According to the credible testimony of Martin Pisciotti, Peter Pan buses often stop in the "No Parking" portion of the public part of Cuthbert Street to let off and take on passengers.

20. The portion of the Greyhound Property which extends from the publicly open portion of Cuthbert Street to North Tenth Street is used by Greyhound and its tenants for exclusive ingress and egress from and to public thoroughfares to the Greyhound Terminal for loading and unloading of their passengers and cargo from Greyhound's and its tenants' motor vehicles. Testimony of M. Pisciotti.

21. Pursuant to bus terminal lease agreements with Greyhound, several other bus companies are Greyhound's tenants at the

Greyhound terminal. Testimony of M. Pisciotti.

22. Pursuant to the bus terminal lease agreements with its tenants, Greyhound provides each tenant with designated areas for bus use and parking, as well as use of Greyhound's terminal and ticketing facilities, for which Greyhound receives compensation. Testimony of M. Pisciotti.

23. Greyhound's policy is that Greyhound's and its tenants use of the Greyhound Property, particularly the portion used for ingress and egress and loading and unloading of buses must be exclusive, unencumbered and unimpeded and cannot be used without permission by Greyhound. Testimony of M. Pisciotti.

24. Beginning on or about September 16, 1993 and continuing thereafter, Peter Pan employees, agents or representative have been driving Peter Pan buses over and across the Greyhound Property directly adjacent to Cuthbert Street behind the Greyhound Terminal. Testimony of M. Pisciotti, Testimony of D. Batchelor, Sr.

25. By letter dated September 23, 1993 and sent via certified mail to David Batchelor, Mr. Pisciotti informed Peter Pan that Peter Pan buses had been driving over and across Greyhound's property and informed Peter Pan that the area used is not a public throughway and that Peter Pan was trespassing on Greyhound's property. Exhibit P–2.

26. David W. Batchelor, Sr. received this letter on September 27, 1993. *Id.*

27. Neither Mr. Batchelor, Sr. nor anyone else at Peter Pan responded to Mr. Pisciotti's letter in any way. Testimony of D. Batchelor, Sr.; Testimony of M. Pisciotti.

28. According to Mr. Batchelor, Sr., Peter Pan's trespass was the result of a misunderstanding regarding zoning. According to Mr. Batchelor, Sr., he had his lawyer check the zoning, and upon learning in October that the Peter Pan buses were trespassing, he ordered the trespass to stop. Mr. Batchelor, Sr.'s explanation about the zoning misunderstanding was supported by no other evidence such as his lawyer's testimony or documenta-

tion of communication with the zoning board. I do not find this account to be credible.

29. Despite being placed on notice that Peter Pan buses were trespassing on Greyhound's property, subsequent to September 27, 1993 Peter Pan buses continued to trespass on Greyhound's property. Specifically, according to the credible testimony of Martin Pisciotti, subsequent to receiving notice that it was trespassing on Greyhound property, Peter Pan employees continued to drive their buses over and across Greyhound's property in an unauthorized manner.

30. On November 22, 1993, plaintiff filed its complaint seeking injunctive relief on its claims for trespass and public nuisance and monetary relief on its other claims.

31. On November 23, 1993, the parties entered into an Agreement of Counsel. The Agreement of Counsel provided that Peter Pan would not trespass on Greyhound's property. Testimony of M. Pisciotti.

32. Despite the Agreement of Counsel, according to the credible testimony of Martin Pisciotti, Peter Pan buses trespassed on Greyhound property in Philadelphia on several occasions after November 23, 1993. Mr. Batchelor, Sr. conceded that such events might have occurred, albeit without his approval.

33. Greyhound is authorized to do business in the State of New Jersey and maintains a facility for this purpose which is located off of Fellowship Road in Mount Laurel, New Jersey ("the Mount Laurel Terminal"). Stipulation of the Parties.

34. There is one vehicle entrance to the Mount Laurel Terminal which clearly identifies the facility as Greyhound property. Testimony of Edward Sperl.

35. On January 3, 1994, according to the credible and uncontradicted testimony of Greyhound employee Edward Sperl, Peter Pan trespassed on Greyhound's property when David W. Batchelor, Jr. intentionally caused a Peter Pan bus, in which he was riding, to trespass on Greyhound property at Greyhound's Mount Laurel, New Jersey facility. See also Exhibit P–4 (Mr. Sperl's written account of events recorded six hours

after). Defendant conceded that this event occurred. Testimony of D. Batchelor, Sr.

36. On January 3, 1994, a Peter Pan employee on the Peter Pan bus distributed flyers advertising Peter Pan's services and fares at the Greyhound property in Mount Laurel. Testimony of Edward Sperl.

37. On January 3, 1994, a Peter Pan employee placed Peter Pan flyers on cars on Greyhound's property in Greyhound's parking lot in Mount Laurel. Testimony of Edward Sperl; Exhibit P–3.

38. During the January 3, 1994 incident in Mount Laurel, according to the credible and uncontradicted testimony of Greyhound employee Edward Sperl, Sperl informed Mr. Batchelor, Jr. that he and Peter Pan bus were unlawfully present on Greyhound property, and Mr. Batchelor, Jr. retorted "we are going to do what we have to do and tell Frank Schmeider [Greyhound's CEO] that." Sperl recorded the substance of this confrontation shortly after the incident. Exhibit P–4.

39. It is custom in the bus industry to aid stranded passengers of another company. Testimony of M. Pisciotti; Testimony of D. Batchelor, Sr.

40. A Peter Pan bus has on at least one occasion entered the Mount Laurel facility to drop off passengers of Greyhound who had been stranded. Testimony of D. Batchelor, Sr.

41. Greyhound leases property on Arch Street in Philadelphia (the "Arch Street Property"), located behind the Greyhound Terminal and immediately connected to Greyhound property. Exhibit P–1. Greyhound is the lessee of the Arch Street Property pursuant to a lease agreement dated December 3, 1990 between Messrs. Balsam and Krawitz and Greyhound Lines, Inc. Under the terms of the lease agreement, Greyhound has the exclusive rights to use and occupy, cross over or enter upon the Arch Street Property. The total monthly amount Greyhound pays for the Arch Street property is $12,083.33. Exhibit P–10.

42. Prior to September 1, 1993 David W. Batchelor, Jr. visited several homeless shelters in the Philadelphia area to recruit workers to wear signboards, hand out flyers, use bullhorns and otherwise advertise Peter Pan's services in front of the Greyhound Terminal in Philadelphia. Testimony of D. Batchelor, Sr. These persons are known in the bus industry as "hawkers." Testimony of M. Pisciotti.

43. Beginning on or about September 1, 1993, and continuing thereafter, David W. Batchelor, Jr. hired, supervised and directed the activities of the Peter Pan hawkers. Testimony of D. Batchelor, Sr. None of the Peter Pan hawkers testified at trial.

44. The hawkers are paid in cash each day they work. Testimony of D. Batchelor, Sr.

45. Prior to the hawkers beginning work for Peter Pan, David W. Batchelor, Jr. met with the hawkers and described their job duties to them. Testimony of D. Batchelor, Sr.

46. Since on or about September 15, 1993, according to the credible testimony of Martin Pisciotti, Richard Willis and Greg Burns, Peter Pan's employees, agents and representatives, including the hawkers, have trespassed in the Greyhound Terminal, including using Greyhound restrooms while on duty for Peter Pan and entering the terminal without intention to purchase a ticket, and have trespassed on the steps to the Greyhound entrance.

47. Since on or about September 15, 1993, according to the credible testimony of Martin Pisciotti, Richard Willis and Greg Burns, "hawkers" employed by Peter Pan have, at the direction of David Batchelor, Jr. and Raphael Cedeno, engaged in the following conduct in front of the Greyhound Terminal:

a. Concentrated their "hawking" activities almost entirely in the area directly in front of the public entrance to the Greyhound;

b. Impeded the entrance to the Greyhound terminal;

c. Stopped cars in the public street;

d. Shouted at passengers entering or near the Greyhound terminal, sometime with the use of bullhorns;

e. Made untrue and disparaging remarks about Greyhound, its services, its fares, the safety of its vehicles and condition of its business and operation;

f. Physically taken the luggage of prospective passengers, and carrying same down the street to the Peter Pan Terminal;

g. Grabbed the arms of members of the public including Greyhound passengers and physically walking them down the street to the Peter Pan Terminal;

h. Given the false impression that there is a labor strike against Greyhound by picketing with signs in front of Greyhound's Terminal and stating that Greyhound is "on strike" and that Greyhound drivers are "scabs";

i. Stopped and blocked cars in the middle of the street and also physically escorted persons exiting taxicabs in front of the Greyhound Terminal and physically walking and leading them down to the Peter Pan Terminal;

j. Threatened a Greyhound's employee with physical violence;

k. Littered in, or around plaintiff's property;

l. The acts of the Peter Pan "hawkers" intensifies on weekends and holidays.

*See also* Plaintiff's Exhibit 5 (videotape of "hawker's" conduct).

48. According to the credible testimony of Martin Pisciotti, after the November 23 Agreement of Counsel prohibiting trespass there were further incidents of trespass by "hawkers" in the Greyhound Terminal.

49. From on or about March 2, 1990 and continuing to on or about May 27, 1993, Greyhound was involved in a labor strike with the Amalgamated Transit Union ("ATU") during which the ATU frequently picketed in front of the Greyhound Terminal. The strike ended on or about May 27, 1993 and there have been no ATU pickets since that date.

## II. CONCLUSIONS OF LAW

1. This Court has jurisdiction over this action pursuant to Title 28 U.S.C. § 1332(a)(1), in that the action is between citizens of different states and the amount in controversy exceeds $50,000. *See* Order of January 19, 1994 denying defendant's motion to dismiss.

2. The acts and occurrences giving rise to the claims alleged in this action took place in substantial part in Philadelphia, Pennsylvania, within the Eastern District of Pennsylvania, and venue is therefore proper in this Court pursuant to Title 28 U.S.C. §§ 1391(a)(2) and (3).

3. Pennsylvania law applies to all plaintiff's claims other than the trespassing incident which occurred in Mount Laurel, New Jersey. *Erie R.R. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

4. New Jersey law applies to the trespassing claim based upon the January 3, 1994 incident in Mount Laurel, New Jersey. *Id.*

■ 5. The plaintiff must prove by a preponderance of the evidence the four requirements for injunctive relief: (1) a reasonable probability of success on the merits; (2) that it would be irreparably injured by denial of the injunctive relief; (3) that granting injunctive relief will not result in greater harm to the non-moving party; and (4) that the relief is in the public interest. *SI Handling Systems, Inc. v. Heisley*, 753 F.2d 1244, 1254–55 (3d Cir.1985); *In re Arthur Treacher's Franchisee Litigation*, 689 F.2d 1137, 1143 (3d Cir.1982).

■ 6. An injury is deemed irreparable if it cannot be adequately compensated by an award of damages. *Cosner v. United Penn Bank*, 358 Pa.Super. 484, 517 A.2d 1337 (1986).

7. Because the trial held on January 24 and 25, 1994 was a final trial on plaintiff's trespass and public nuisance claims, plaintiff must establish that it is entitled to relief on those claims (as opposed to establishing a probability of success on the merits) before injunctive relief can be granted.

■ 8. Under Pennsylvania common law a party is liable for trespass if it intentionally enters land in possession of another or causes a third party to do so. *C & K Coal Co. v. United Mine Workers of America*, 537

F.Supp. 480, 487 (W.D.Pa.1982); Restatements (Second) of Torts § 158.

9. Under New Jersey common law, a party is liable for trespass if it intentionally enters land in possession of another or causes a third party to do so. *Burke v. Briggs*, 239 N.J.Super. 269, 571 A.2d 296 (1990).

10. Pennsylvania has adopted Section 821B of the Restatement (Second) of Torts for the elements of a claim for public nuisance. *Com. v. Danny's Book Store*, 155 Pa.Cmwlth. 281, 625 A.2d 119, 121–22 (1993); *Muehlieb v. City of Philadelphia*, 133 Pa. Cmwlth. 133, 574 A.2d 1208, 1211 (1990).

11. Section 821B provides:

(1) A public nuisance is an unreasonable interference with a right common to the general public.

(2) Circumstances that may sustain a holding that an interference with a public right is unreasonable include the following:

    (a) whether the conduct involves a significant interference with the public health, the public safety, the public peace, the public comfort, or the public convenience, or

    (b) whether the conduct is proscribed by a statute, ordinance or administrative regulation, or

    (c) whether the conduct is of a continuing nature or has produced a permanent or longlasting effect, and, as the actor knows or has reason to know, has a significant effect upon the public right.

12. Interference with a public right is unreasonable when the conduct involves a significant interference with the public's safety, the public peace, the public comfort or the public convenience. *Muehlieb v. City of Philadelphia*, 133 Pa.Cmwlth. 133, 574 A.2d 1208, 1211 (1990).

13. After a plaintiff establishes that a defendant has created and maintained a public nuisance, the requirements of Restatement (Second) of Torts Sections 821C(1) applies in determining whether a plaintiff has standing to enjoin such conduct.

Section 821C(1) provides in relevant part:

In order to recover damages in an individual action for a public nuisance, one must have suffered harm of a kind different from that suffered by other members of the public exercising the right common to the general public that was the subject of the interference

*Pottstown Industrial Complex v. P.T.I. Services, Inc.*, 1992 WL 50084 at *9 (E.D.Pa. 1992).

14. The same standing requirement to bring a public nuisance claim applies whether a plaintiff is seeking damages or injunctive relief. *Pottstown Industrial Complex*, 1992 WL 50084 at *9.

15. The failure to testify of a witness peculiarly in the control of one party permits the inference by the fact-finder that had he or she testified her testimony would not have been favorable to that party. *Chicago College of Osteopathic Medicine v. George A. Fuller Co.*, 719 F.2d 1335, 1353 (7th Cir. 1984).

### III. DISCUSSION

#### A. Trespass

Plaintiff seeks an injunction for two different kinds of trespass. First, it seeks to stop the use of its Arch Street and Cuthbert Street properties by Peter Pan bus drivers. Second, it wants to enjoin "hawkers" from entering the Greyhound terminal, to use the bathroom or for any other reasons, and from standing, sitting or marching on the steps to the entrance to the Greyhound terminal.

The plaintiff has succeeded on the merits of its claim of trespass by Peter Pan busdrivers. Defendant admits frequent trespass until late October, and concedes the possibility that further incidents of trespass over Cuthbert Street have occurred since. Findings ¶ 24. Mr. Batchelor's testimony that the trespass in September and October was the result of a mistake about zoning was not credible. Findings ¶ 28. Furthermore, further trespass conduct has occurred since late October. Findings ¶ 29.

Additionally, David Batchelor, Jr., an employee of the defendant trespassed with impunity on Greyhound property in Mount Laurel, New Jersey in January of 1994.

Findings ¶¶ 35–38. Mr. Batchelor, Sr. conceded that this event of trespass occurred. Findings ¶ 35. I infer from Mr. Batchelor, Jr.'s failure to testify, that had he done so he would have confirmed Mr. Sperl's account of the events including the antagonistic language which Mr. Sperl attributed to Mr. Batchelor, Jr. This conduct contradicts the assertion by David Batchelor, Sr. that earlier trespasses were merely the result of a misunderstanding about who had a right to traverse Cuthbert Street.

The plaintiff also prevails on the merits on its charge of trespass by the "hawkers." The "hawkers" have throughout the period of their employment entered the Greyhound Terminal without purchasing a ticket. Findings ¶ 46. Whether this was done to use the restroom facilities or for any other activities, such conduct constitutes trespass. The "hawkers" have also trespassed on the steps to the Greyhound facility. *Id.* None of the "hawkers" or their direct supervisors testified in contradiction to the plaintiff's witnesses' accounts.

■ Both types of trespass activity threaten irreparable injury as legally defined. It is well grounded in Pennsylvania law that continuing trespass is properly enjoined because recovery in damages, while possible, is impractical because the cost of pursuing a recovery will usually exceed the recovery itself. *See e.g. Sullivan v. Jones & Laughlin Steel Co.*, 208 Pa. 540, 57 A. 1065 (1904); *Keppel v. Lehigh Coal & Navigation Co.*, 200 Pa. 649, 50 A. 302 (1901).

■ There is no contention by the defendant, nor could there be, that the defendant would be harmed by an injunction to a greater extent than the plaintiff would be were the injunction not issued. The plaintiff has no right to benefit from illegal trespass.

The public interest will also not be harmed from enjoining illegal conduct. Furthermore, public safety will be enhanced by ensuring that only the legal and liable possessors of the property will be traversing it.[1]

### B. Public Nuisance

■ The plaintiff has not met its burden of proving public nuisance. The law of public nuisance comprehends threats to the public at large, not specific persons. The evidence presented reveals inconvenience and obnoxious behavior towards Greyhound passengers as they enter the terminal.[2] Findings ¶ 46–48. The plaintiff has offered no case law, and I find none which suggests that the class of people which must be affected to constitute a "public" nuisance can be so narrowly defined. The evidence does not show harm to the safety and comfort of the public at large who are traveling on Filbert Street. I also do not find, and the plaintiff has not suggested, any case law suggesting that the hawker's conduct—whether characterized as aggressive marketing or picketing—constitutes a public nuisance. I am obligated in deciding Pennsylvania public nuisance to determine what the state Supreme Court would decide if faced with these facts. I find no reason, and plaintiff has offered none, to suggest that the Pennsylvania Supreme Court would extend the scope of the public nuisance tort to this type of activity.

■ Plaintiff also contends that the hawker's conduct constitutes a nuisance *per se* by virtue of violating city ordinances. However, plaintiff has not proved that the hawkers violated either of the ordinances which it asserts are applicable—Philadelphia Code § 10–404 prohibiting excessive noise, and § 10–603 prohibiting loitering. The plaintiff

---

1. Defendants suggested both at trial and in its post-trial brief that the public interest might be harmed by a trespass injunction because it would discourage Peter Pan busdrivers from aiding stranded Greyhound passengers as is the custom in the bus industry for fear of violating the injunction when it returned the passengers to a Greyhound station. However, Mr. Batchelor, Sr. conceded that should a Peter Pan driver be confronted with this circumstance, he would not order that driver to leave the stranded Greyhound passengers, but would instead bring them to a Peter Pan terminal. Accordingly, an injunction against trespass might alter the fortunes of Greyhound, but would not impact on stranded passengers.

2. The plaintiff's suggested that the "hawkers" blocked the public streets. The evidence presented at trial did not convince me that any examples of this were so persistent as to constitute a substantial impediment to the public.

testified without contradiction that the hawkers used bullhorns to advertise Peter Pan, often at high decibels. However, no further evidence, in the form of citations or recordings was presented which would allow the plaintiff to meet its burden of proving that the bullhorn shouts were excessive as defined by the Code.

The loitering ordinance which plaintiff relies on defines "loitering" as "idling or lounging." The videotape evidence shown in court does not support such a characterization of the hawker's conduct. The hawkers' complained of conduct was in fact active and aggressive, albeit confined to the small area in front of the Greyhound steps.

The plaintiff also asserts a nuisance created by Peter Pan busdrivers who stop to let off passengers in the public portion of Cuthbert Street. However, the evidence indicates that the drivers stopped only in that portion marked "No Parking." Findings ¶ 19. That instruction does not prohibit vehicles from "stopping," with the driver remaining in the vehicle, for a short period while passengers disembark. Findings ¶¶ 17–18. As this conduct is not legally prohibited, I find no basis for designating it a public nuisance.

Because I find that the plaintiff did not meet its burden on the first element of common law public nuisance—injury to the public at large—I need not address the second element, plaintiff's standing to sue based on suffering an injury distinct from the public. Because plaintiff fails to show reasonable possibility of success on the merits, I also decline to address the additional requirements for injunctive relief: irreparable injury, harm to the defendant, and public interest.

AND NOW, IT IS ORDERED that:

1. Judgment is entered in favor of the plaintiff on its claims of trespass, and defendant and its employees are ENJOINED from

   a. Driving its buses over Greyhound property in Philadelphia, including, but not limited to the non-public portion of Cuthbert Street, and Greyhound's Arch Street Property, except to return stranded Greyhound passengers to the terminal when necessary.

   b. Entering the Greyhound Terminal except when permitted by Greyhound.

   c. Standing or marching on the steps to the Greyhound Terminal.

2. Judgment is entered in favor of the defendant and against the plaintiff on plaintiff's claims of public nuisance.