CITY OF PHILADELPHIA, Guardian Civic League of Philadelphia, Aspira, Inc. of Pennsylvania, Residents Advisory Board, Northeast Home School and Board, and Philadelphia Citizens for Children and Youth, Plaintiffs,

v.

BERETTA U.S.A., CORP., Browning, Inc., Bryco Arms, Inc., Colt's Manufacturing Co., Glock, Inc., Harrington & Richardson, Inc., International Armament Industries, Inc., Kel–Tec, CNC Lorcin Engineering Co., Navegar, Inc., Phoenix/Raven Arms, Smith & Wesson Corp., Sturm, Ruger & Co., and Taurus International Firearms, et al., Defendants.

No. CIV.A.2000–CV–2463.

United States District Court, E.D. Pennsylvania.

Dec. 20, 2000.

Richard Feder, City of Philadelphia Law Dept., Philadelphia, PA, Richard S. Lewis, Cohen, Milstein, Hausfeld and Toll, Washington, DC, Marcia Berman, Chief Deputy City Solicitor, Philadelphia, PA, Michael J. Boni, Kohn, Swift & Graf, P.C., Philadelphia, PA, Kenneth I. Trujillo, City Solicitor, City Law Dept., Philadelphia, PA, for City of Philadelphia.

Richard S. Lewis, Cohen, Milstein, Hausfeld and Toll, Washington, DC, Michael J. Boni, Kohn, Swift & Graf, P.C., Philadelphia, PA, Kenneth I. Trujillo, City Solicitor, City Law Dept., Philadelphia, PA, for Guardian Civic League of Philadelphia, Aspira, Inc. of Pennsylvania, Residents Advisory Bd., Northeast Home and School, Philadelphia Citizens for Children and Youth.

Jennifer Dufault James, Schnader, Harrison, Segal & Lewis, Philadelphia, PA, Louis R. Moffa, Jr., Schnader, Harrison, Segal & Lewis, Cherry Hill, NJ, Lawrence S. Greenwald, Gordon, Feinblatt, Rothman, Hoffberger & Hollander, LLC, Baltimore, MD, for Beretta U.S.A. Corp.

Louis R. Moffa, Jr., Schnader, Harrison, Segal & Lewis, Cherry Hill, NJ, Eric A. Weiss, Marshall, Dennehey, Warner, Coleman & Goggin, Philadelphia, PA, for Browning Inc.

Louis R. Moffa, Jr., Schnader, Harrison, Segal & Lewis, Cherry Hill, NJ, Debra Schwaderer Dunne, Thorp Reed & Armstron, LLP, Philadelphia, PA, for Bryco Arms, Inc.

John E. Iole, Jones, Day, Reavis & Pogue, Pittsburgh, PA, Louis R. Moffa, Jr., Schnader, Harrison, Segal & Lewis, Cherry Hill, NJ, Thomas E. Fennell, Jones, Day, Reavis & Pogue, Dallas, TX, Michael L. Rice, Jones, Day, Reavis & Pogue, Dallas, TX, for Colt's Manufacturing Co., Inc.

Louis R. Moffa, Jr., Schnader, Harrison, Segal & Lewis, Cherry Hill, NJ, Eric A. Weiss, Marshall, Dennehey, Warner, Coleman & Goggin, Philadelphia, PA, John F. Renzulli, Renzulli & Rutherford, L.L.P., New York, NY, for Glock, Inc.

Louis R. Moffa, Jr., Schnader, Harrison, Segal & Lewis, Cherry Hill, NJ, for Harrington & Richardson, Inc., Intern. Armament Corp., Lorcin Engineering Co., Inc., Navegar, Inc., Phoenix/Raven Arms, Taurus Intern. Firearms.

Louis R. Moffa, Jr., Schnader, Harrison, Segal & Lewis, Cherry Hill, NJ, Eric Weiss, Marshall, Dennehey, Warner, Coleman & Goggin, Philadelphia, PA, for Kel-Tec CNC.

Robert C. Heim, Dechert, Price & Rhoads, Philadelphia, PA, Gary R. Long, Shook, Hardy & Bacon, LLP, Kansas City, MO, Louis R. Moffa, Jr., Schnader, Harrison, Segal & Lewis, Cherry Hill, NJ, George M. Gowen, III, Dechert Price & Rhoads, Philadelphia, PA, Jeffrey S. Nelson, Shook, Hardy & Bacon, LLP, Kansas City, MO, for Smith & Wesson Corp., Inc.

Louis R. Moffa, Jr., Schnader, Harrison, Segal & Lewis, Cherry Hill, NJ, James P. Dorr, Wildman, Harrold, Allen and Dixon, Chicago, IL, Robert N. Spinelli, Kelley, Jasons, McGuire & Spinelli, Philadelphia, PA, for Sturm, Ruger & Co., Inc.

*OPINION*

SCHILLER, District Judge.

## TABLE OF CONTENTS

INTRODUCTION ....................................................886
STANDARD FOR MOTION TO DISMISS .........................887
REGULATION OF FIREARMS .......................................887
FACTS ALLEGED IN THE COMPLAINT ........................888
DISCUSSION .........................................................889
  I.  Philadelphia's suit is barred by the Uniform Firearms Act ("UFA")...............889
    A.  Section 6120 ................................................889
    B.  Section 6120(a.1) ("UFA Amendment")..............................890
      1.  Plain meaning ........................................890
      2.  Impetus for statute ..................................890
      3.  Legislative history ...................................891
    C.  UFA Amendment is Constitutional ...............................891
      1.  Federal Constitution .................................891
      2.  Pennsylvania Constitution ..........................892

        a. State may revoke municipal power ............................... 892
        b. The City had no accrued causes of action ......................... 894
    D. Municipal Cost Recovery Rule ....................................... 894
II. Organizational plaintiffs lack standing ................................. 895
    A. Standing ......................................................... 896
    B. Germaneness ..................................................... 897
    C. Participation of individual members ................................. 897
III. Role of trial court in developing new law ................................. 898
IV. Negligence and Negligent Entrustment ................................... 898
    A. Lack of duty ..................................................... 898
        1. Negligence ................................................. 898
            a. Relationship of parties ....................................... 899
            b. Social utility ............................................. 899
            c. Harm and foreseeability ................................... 900
            d. Consequences to defendants ............................... 902
            e. Public interest ........................................... 902
        2. Negligent Entrustment ....................................... 902
    B. Proximate cause—Remoteness ..................................... 903
        1. Six factor test ............................................... 903
            a. Causal connection ......................................... 904
            b. Specific intent to harm ..................................... 904
            c. Nature of plaintiffs' injuries ................................. 904
            d. Directness or indirectness of injuries ......................... 905
            e. Speculativeness ........................................... 905
            f. Duplicate recovery/complex apportionment ..................... 906
        2. Governmental standing ....................................... 906
V. Public nuisance ....................................................... 906
    A. Elements of Public Nuisance ....................................... 907
    B. Limitations on Public Nuisance Law ................................. 908
        1. Restricted interpretations of "unreasonable interference with public
           rights" ..................................................... 908
        2. Nuisance inapplicable to product design and distribution ................. 909
CONCLUSION ....................................................... 911

## INTRODUCTION

The instant action is a high profile case brought by the City of Philadelphia and certain civic organizations against the gun industry. At the outset, I caution the public to appreciate what this case is *not* about, just as we must strive to understand what this case truly concerns. Primarily, this case is not about the Second Amendment and the right to bear arms. Rather, this case involves the plaintiffs' claims that the gun industry's methods for distributing guns are negligent and a public nuisance.

The plaintiffs originally filed their complaint in the Pennsylvania Court of Common Pleas for the County of Philadelphia. Beretta U.S.A. Corp., acting on behalf of itself and other gun manufacturers,[1] removed the action to this Court and filed a motion to dismiss, challenging (1) the City's power to sue under state law; (2) the standing of the various civic organizations to bring suit; (3) the plaintiffs' ability to state a cause of action for public nuisance; or (4) on negligence grounds. I have jurisdiction pursuant to 28 U.S.C. § 1441 (1993) (removal) and 28 U.S.C. § 1332 (1993) (diversity of citizenship). Having reviewed the complaint, the motion to dismiss, the scholarly briefs, arguments before this Court by all parties, and the

---

1. Beretta's co-defendants are: Browning, Inc., Bryco Arms, Inc., Colt Manufacturing, Co., Glock, Inc., Harrington & Richardson, Inc., International Armament Corp., Kel–Tec CNC, Lorcin Engineering, Co., Navegar, Inc., Phoenix/Raven Arms, Smith & Wesson, Inc., Sturm, Ruger & Co., and Taurus International Firearms. Lorcin entered Chapter 7 Bankruptcy on September 10, 1999 in the Bankruptcy Court for the Central District of California. For the sake of convenience, I will refer to the defendants collectively throughout this opinion as "the gun manufacturers" or the "gun industry."

applicable law, I find the plaintiffs lack standing and cannot recover under any legal theory asserted. Therefore, I am dismissing this case.

### LEGAL STANDARD FOR CONSIDERING A MOTION TO DISMISS

In considering defendants' motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a court may only look to the allegations in the complaint, exhibits attached thereto, any reasonable inferences therefrom, and matters of public record. See *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir.1993); *Markowitz v. Northeast Land Co.*, 906 F.2d 100, 103 (3d Cir.1990). The court must view the complaint in the light most favorable to the plaintiff, see *Tunnell v. Wiley*, 514 F.2d 971, 975 n. 6 (3d Cir.1975); *Rothman v. Specialty Care Network, Inc.*, No. Civ.A. 00–2445, 2000 WL 1470221 at *3 (E.D.Pa. Oct. 3, 2000), and take well pleaded allegations as true. See *Colburn v. Upper Darby Township*, 838 F.2d 663, 664–65 (3d Cir.1988). However, "a court need not credit a complaint's 'bald assertions' or 'legal conclusions.'" *Pennsylvania v. Rand Finan. Corp.*, No. Civ.A. 99–4209, 2000 WL 1521589 at *2 (E.D.Pa. Oct. 3, 2000) (quoting *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir.1997)). When no set of facts could be proven which would guarantee a right to relief, the case must be dismissed. See *Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380, 1391 (3d Cir.1994).

■ A similar standard is used when ruling on a motion to dismiss for lack of standing. See *Warth v. Seldin*, 422 U.S. 490, 503, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). A motion challenging standing im-

plicates the court's jurisdiction, and falls under the rubric of Fᴇᴅ.R.Cɪᴠ.P. 12(b)(1). See *Maio v. Aetna Inc.*, 221 F.3d 472, 482 n. 7 (3d Cir.2000); *Society Hill Towers Owners' Ass'n v. Rendell*, 210 F.3d 168, 175 (3d Cir.2000). The court must accept all material allegations of the complaint as true, and construe facts in favor of the complaining party. See *Warth*, 422 U.S. at 503, 95 S.Ct. 2197. In addition, a court may consider affidavits which support a finding of standing. See *id.*[2]

### THE REGULATION OF FIREARMS

Before turning to the allegations of the complaint, it may be helpful to briefly summarize the federal and state laws regulating the sale and distribution of firearms in the United States and in the Commonwealth of Pennsylvania. Gun manufacturers must be licensed by the federal government in order to produce, deal, and ship firearms in interstate commerce. See 18 U.S.C. § 922(a)(1) (2000). Manufacturers may only sell to licensed importers, licensed dealers, or licensed collectors. See 18 U.S.C. § 922(a)(2) (2000). Licensed dealers, in turn, may only sell to those who have been cleared by the Federal Bureau of Investigations (FBI). See 18 U.S.C. § 922(t)(1) (2000). The law also establishes age limits for purchasers of guns and ammunition. See 18 U.S.C. § 922(b)(1) (2000). Additionally, licensees may not sell firearms to individuals who are felons, drug users, inmates of mental institutions, illegal aliens, subject to domestic restraining orders, or those convicted of crimes of domestic violence. See 18 U.S.C. § 922(d)(1)–(9) (2000). Those individuals are also prohibited from possessing firearms which affect interstate commerce. See 18 U.S.C. § 922(g)(1)–(9) (2000). No

---

**2.** Plaintiffs have submitted one affidavit as an example of the type of evidence which would be produced during discovery, which I have given due consideration.

While *Warth* also mentions that a district court has the power to allow the amendment of a complaint to repair a standing defect, *Warth*, 422 U.S. at 501, 95 S.Ct. 2197, such a

course would be futile here. Even were I to allow plaintiffs to amend their complaint, it suffers from too many legal defects to be repaired. See *Alvin v. Suzuki*, 227 F.3d 107, 121 (3d Cir.2000); *Smith v. NCAA*, 139 F.3d 180, 190 (3d Cir.1998), *rev'd on other grounds*, 525 U.S. 459, 119 S.Ct. 924, 142 L.Ed.2d 929 (1999).

one is permitted to sell firearms to a juvenile. *See* 18 U.S.C. § 922(x)(1) (2000). It is also unlawful for anyone to attempt to acquire a firearm by making a false statement.

The Pennsylvania Uniform Firearms Act supplements the federal scheme. *See* 18 PA. CONS.STAT.ANN. § 6101 *et seq.* (West 2000) ("UFA"). This comprehensive statute, among other things, enables reputable prospective dealers to obtain licenses from the police for the sale of firearms to consumers, *see* UFA § 6113(a), forbids licensed dealers from violating any provision of the UFA, *see* UFA § 6113(a)(1), and requires dealers to keep written records for the sale of each firearm, *see* UFA § 6111, 6113(a)(2). Those seeking to purchase guns must undergo a background check by the Pennsylvania Police. *See* UFA § 6111. A sale under circumstances intended to provide a firearm to an individual ineligible to possess it constitutes a felony. *See* UFA § 6111(g)(2). With this background, I now turn to the allegations in the complaint.

### FACTS ALLEGED IN THE COMPLAINT

The City of Philadelphia and a number of civic organizations filed a 34–page complaint purporting to connect gun violence in the city to the defendant gun manufacturers. The City of Philadelphia ("City") sues both in its sovereign and in its "individual" capacities for, respectively, harm to its citizens and municipal costs related to gun violence. Cmplt. at ¶ 2. Joining Philadelphia as plaintiffs are ASPIRA, Inc., Guardian Civic League, Residents Advisory Board, Northeast Home and School, and Philadelphia Citizens for Children and Youth. Cmplt. at ¶¶ 3–7. I will refer to these five organizations collectively as the "organizational plaintiffs." The Guardian Civic League aims "to improve relations between the Philadelphia Police Department and minority communities, to recruit minority officers, and to work toward the elimination of racial discrimination."

Cmplt. at ¶ 3. ASPIRA provides educational, leadership, and community support services for Puerto Rican and Latino youths and parents. Cmplt. at ¶ 4. The Residents Advisory Board represents tenants who inhabit the Philadelphia Housing Authority properties on quality of life issues. Cmplt. at ¶ 5. Northeast Home and School is a organization for parents and students of a public high school, and Philadelphia Citizens for Children and Youth is a child advocacy organization. Cmplt. at ¶¶ 6–7. The organizational plaintiffs ostensibly sue for their own costs and on behalf of harm suffered by their members. Cmplt. at ¶ 3–7.

The plaintiffs' core allegation is that the defendants' marketing and distribution schemes are responsible for placing guns where they do damage to residents of the City. Plaintiffs allege that the defendants know, or willfully avoid knowing, that their distribution channels allow guns to fall into the hands of criminals and children. First, the plaintiffs allege that some individuals, who have passed a background check by the Pennsylvania Police, lawfully purchase one or more firearms. Cmplt. at ¶ 24. These buyers, called "straw buyers" by the plaintiffs, then resell their weapons to felons and others unable to legally obtain or possess firearms. Cmplt. at ¶¶ 24–28. The plaintiffs accuse the gun manufacturers of knowing which federally licensed dealers are more likely to sell guns to straw buyers. Cmplt. at ¶¶ 31, 40. They seek to fault the gun manufacturers for failing to monitor and supervise federal firearms licensees.

Second, the plaintiffs also allege that the defendants' marketing schemes are designed to appeal to criminals. Cmplt. at ¶¶ 58–59. Lastly, the plaintiffs complain that the gun industry advertises its guns as safe or beneficial for use in the home, while the presence of guns increases the risk of suicide and domestic violence involving firearms. Cmplt. at ¶¶ 62–63. Plaintiffs' complaint invokes negligence,

negligent entrustment, and public nuisance liability.

## DISCUSSION

■ This court finds that Pennsylvania law governs all state law claims in this action. *See Peerless Heater Co. v. Mestek, Inc.,* Civ.A. No. 98–CV–6532, 2000 WL 637082, 2000 U.S. Dist. LEXIS 6664, at *34 n. 13 (E.D.Pa. May 11, 2000). In order to forecast how Pennsylvania's Supreme Court would resolve the many unsettled questions of state law which this complaint raises, a federal court must consider "relevant state precedents, analogous decisions, considered dicta, scholarly works, and any other reliable data tending convincingly to show how the highest court in the state would decide the issue at hand." *Markel v. McIndoe,* 59 F.3d 463, 473 n. 11 (3d Cir.1995) (quoting *McKenna v. Ortho Pharm. Corp.,* 622 F.2d 657, 663 (3d Cir.1980)).

## I. PHILADELPHIA IS BARRED FROM FILING SUIT UNDER THE UNIFORM FIREARMS ACT

■ In Pennsylvania, the Uniform Firearms Act,18 PA. CONS.STAT.ANN. § 6101 *et seq.* (West 1999) ("UFA") regulates the possession and use of firearms. Pennsylvania's Supreme Court has found that UFA § 6120 deprives the City of Philadelphia of the *power to regulate* firearms such as assault weapons. *See Ortiz v. Commonwealth,* 545 Pa. 279, 681 A.2d 152 (1996). Today, I hold that the UFA also deprives the City of the *power to sue* in the role of parens patriae.[3]

### A. This lawsuit is a form of regulation barred by UFA § 6120

In 1996, the Pennsylvania Supreme Court dispatched a prior attempt by the City to regulate firearms within its boundaries. *See Ortiz v. Commonwealth,* 545 Pa. 279, 681 A.2d 152 (1996). In *Ortiz,*

Philadelphia and Pittsburgh attempted to enjoin the UFA's application to municipal regulations on assault weapons. *See id.* at 154. The Commonwealth Court denied their petition, and the Pennsylvania Supreme Court affirmed, observing that Philadelphia does not have an intrinsic right to "maintain peace on its streets through the regulation of weapons." *See id.* at 154, 156. As a matter of constitutional power, a home rule municipality may not exercise any power which the General Assembly has taken away by general statute. *See id.* (citing PA. CONST. art. IX, § 2). The court further held that the regulation of firearms was particularly appropriate for state legislation because the ownership of firearms is constitutionally protected in Pennsylvania. *See id.* Paraphrasing the state constitutional guarantee, the court concluded that Philadelphia could not abridge the right to bear arms because that right "shall not be questioned." *See id.* (quoting PA. CONST. art. I, § 21).

What the City cannot do by act of the City Council it now seeks to accomplish with a lawsuit. The United States Supreme Court has recognized that the judicial process can be viewed as the extension of a government's regulatory power. As the court explained, "[s]tate power may be exercised as much by a jury's application of a state rule of law in a civil lawsuit," as by regulation or ordinance. *BMW of North America, Inc. v. Gore,* at 572 n. 17, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996); *see also Geier v. American Honda Motor Co.,* 529 U.S. 1913, 120 S.Ct. 1913, 1925, 146 L.Ed.2d 914 (2000); *Int'l Paper Co. v. Ouellette,* 479 U.S. 481, 495, 107 S.Ct. 805, 93 L.Ed.2d 883 (1987); *New York Times v. Sullivan,* 376 U.S. 254, 265, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). Similarly, the City's instant action seeks to control the gun industry by litigation, an end the City could not accomplish by passing an ordi-

---

**3.** The City asked the court to defer ruling on its standing since its co-plaintiffs have standing to press forward with this suit. Resp. in Opp. at 95 (citing *Powell v. Ridge,* 189 F.3d 387, 404–05 (3d Cir.1999)). Because I find the City's co-plaintiffs lack standing as well, *see infra* section II, I am compelled to evaluate the City's ability to sue.

nance. Under Pennsylvania law and by unequivocal Pennsylvania Supreme Court precedent, the power to regulate firearms within the state now lies exclusively with the state legislature.

### B. The lawsuit is barred by the UFA Amendment, § 6120(a.1)

A 1999 amendment to the UFA also deprives the city of the power to sue because it specifically bars a variety of municipal suits against gun manufacturers. The UFA Amendment provides:

> (a.1) NO RIGHT OF ACTION.—(1) No political subdivision may bring or maintain an action at law or in equity against any firearms or ammunition manufacturer, trade association or dealer for damages, abatement, injunctive relief or any other relief or remedy resulting from or relating to either the lawful design or manufacture of firearms or ammunition or the lawful marketing or sale of firearms or ammunition to the public. (2) Nothing in this subsection shall be construed to prohibit a political subdivision from bringing or maintaining an action against a firearms or ammunition manufacturer or dealer for breach of contract or warranty as to firearms or ammunition purchased by the political subdivision.

UFA § 6120(a.1) (West 1999).[4] The statute defines "political subdivision" to include any "home rule charter" municipality or city. UFA § 6120(b).

### 1. Plain meaning

The clear meaning of the UFA Amendment prohibits home rule municipalities such as Philadelphia from suing gun manufacturers for the production and distribution of firearms, with limited exclusions for contract or warranty actions specified in the second paragraph. See UFA § 6120(a.1).

▄ There is a presumption of legitimacy of statutes, and in its absence of an ambiguity, a statute is to be given its plain meaning. See 1 PA. CONS.STAT.ANN. § 1921(b) (West 1995); Commonwealth v. Stanley, 498 Pa. 326, 446 A.2d 583 (1982). The statute prohibits cities from bringing or maintaining suits against the gun industry. The statute clearly refers to nuisance actions because it mentions "abatement." UFA § 6120(a.1).[5] The City argues that the statute only precludes suit for the "lawful" manufacture of firearms and permits the City's suit because it alleges unlawful conduct. However, the drafters of the UFA Amendment chose to withdraw contract and warranty actions from the UFA Amendment's ambit, UFA § 6120(a.1)(2), but left no separate exclusion for suits alleging "unlawful" conduct.[6] Therefore, the plain language of the UFA Amendment bars this suit.

### 2. Impetus for the statute

Additional support for the application of the UFA Amendment to bar the instant

---

4. Similar statutes have been passed in at least seventeen other states. See, e.g. ALASKA STAT. § 09.65.155 (Michie 2000); ARIZ.REV.STAT. § 12–714 (2000); ARK.STAT.ANN. §§ 16–105–501 (1999); COLO.REV.STAT. § 13–21–501 to 505 (2000); GA.CODE ANN. § 16–11–184 (2000); House Bill 15, 2000 Ky.Acts 213; LA.REV.STAT.ANN. § 40:1799 (West 2000); ME. REV.STAT.ANN. tit. 30–A, § 2005 (West 1999); MICH.COMP.LAWS § 600.294 (2000); MONT.CODE ANN. § 7–1–115 (1999); NEV.REV.STAT.ANN. § 12.107 (1999); OKLA.STAT. tit. 21, § 1289.24a (1999); S.D.CODIFIED LAWS § 21–58–2 (Michie 2000); TENN.CODE ANN. § 39–17–1314 (1999); TEX.CIV.PRAC. & REM.CODE ANN. § 128.001 (West 2000); UTAH CODE ANN. § 78–27–64 (2000); VA.CODE ANN. § 15.2–915.1 (Michie 2000). One court has interpreted an

analogous statute differently than this court, see Morial v. Smith & Wesson, 98–18578, 2000 WL 248364, at *2–3 (La.Div.D.Ct. Feb. 28, 2000), for reasons explained later in this opinion.

5. Abatement is a remedy traditionally available in nuisance actions. See W. PAGE KEETON, PROSSER AND KEETON ON THE LAW OF TORTS § 89 at 641–42 (5th ed. 1984) ("Prosser and Keeton")

6. In any event, the gun manufacturers' conduct is not unlawful under Pennsylvania statute and case law. Therefore, I have no further reason to address the City's claims on this point.

action may be drawn the rule in *Heydon's Case,* 76 Eng. Rep. 637 (Ex. 1584). According to that venerable rule, a court's aim in statutory interpretation is to identify the mischief and defect that existed prior to the passing of the statute which the new law was meant to remedy. *See id.; Sun Shipbuilding & Dry Dock Co. v. Unemployment Comp. Bd. of Review,* 358 Pa. 224, 56 A.2d 254 (19478). The statute clearly reflects the legislature's intention. Subject to certain explicit exceptions, it passed a clear, unequivocal barrier to suit for all municipalities in Pennsylvania. Therefore, the statute should be read to prevent such suits.

### 3. Legislative History

The City points to legislative history to support its claims that the legislature never meant to prohibit municipal suits alleging unlawful conduct. As Judge Dalzell of this court recently reminded us, the use of legislative history in statutory interpretation is akin to "entering a crowded cocktail party and looking over the heads of the guests for one's friends." *U.S. v. Lee,* 82 F.Supp.2d 384, 387 n. 14 (E.D.Pa.2000) (quoting *Conroy v. Aniskoff,* 507 U.S. 511, 519, 113 S.Ct. 1562, 123 L.Ed.2d 229 (1993) (Scalia, J. concurring)). Even where a court may look at, *inter alia,* the occasion and necessity for the statute, the circumstances under which it was enacted, contemporaneous legislative history, and legislative interpretations, *see* 1 Pa. Cons.Stat. Ann. § 1921(c); *see Borough of Glendon v. Dep't of Envt'l Resources,* 145 Pa.Cmwlth. 238, 603 A.2d 226 (1992), the remarks of an individual legislator in legislative debates represent his or her own view and are not relevant to ascertaining the intent of the Assembly as a whole. *McCormick v. Columbus Conveyer Co.,* 522 Pa. 520, 564 A.2d 907, 910 n. 1 (1989); *Martin v. Soblotney,* 502 Pa. 418, 466 A.2d 1022, 1026 (1983). In contrast, comments or reports of a committee or commission may guide interpretation. *See* 1 Pa. Cons.Stat.Ann. § 1939 (West 1995); *Hatter v. Landsberg,* 386 Pa.Super. 438, 563 A.2d 146 (1989).

The instant case provides an excellent example of why legislative history is so unreliable. The City primarily relies on the statements of individual legislators expressing their own opinions that the bill which became UFA Amendment permitted suits alleging unlawful conduct. While the City can point to legislators advocating its point of view, there are others which saw the bill differently. In fact, a review of the legislative history of the statute shows that the driving animus behind the UFA Amendment was to prohibit this very case.

### C. The UFA Amendment is Constitutional

■ Fearing the UFA Amendment might bar its suit, the City has also attacked the statute's constitutionality. The thrust of its argument is that the passage of the UFA Amendment violates "due process" and the separation of powers between the Pennsylvania legislature and the courts. In essence, the City claims that the enactment of the UFA Amendment in 1999 came after its cause of action had already vested. Therefore, Philadelphia claims, the deprivation of its right to sue violated both the separation of powers doctrine and due process protections in the Pennsylvania Constitution. Unfortunately, the City's brief is a pastiche of federal and state constitutional case law, making it difficult to tell whether they assert claims under the Pennsylvania or federal constitution. In either event, the City's challenge cannot succeed.

### 1. Federal Constitution

■ I will quickly dispose of the City's challenge under the federal constitution. Cities receive no protection under the federal constitution for actions of the state legislature. *Hunter v. City of Pittsburgh,* 207 U.S. 161, 178–79, 28 S.Ct. 40, 52 L.Ed. 151 (1907). In *Hunter,* the U.S. Supreme Court rejected an argument that the due process clause protected a municipal entity from increased taxation as the

result of a state legislative scheme to consolidate two cities. Rather than resting on a narrow holding, the court wrote, "Municipal corporations are political subdivisions of the State, created as convenient agencies for exercising such of the governmental powers of the State as may be entrusted to them." *Id.* at 178, 28 S.Ct. 40. The state, then, may retake or withdraw all such powers provided such action is consistent with the state constitution and law.[7] *See id.; City of Trenton v. New Jersey,* 262 U.S. 182, 43 S.Ct. 534, 67 L.Ed. 937 (1923); *see also Sch. Dist. of Philadelphia v. Pennsylvania Milk Mktg. Bd.,* 877 F.Supp. 245 (E.D.Pa.1995) (holding state-created school board cannot sue another part of the state for constitutional violations); *Northwestern Sch. Dist. v. Pittenger,* 397 F.Supp. 975 (W.D.Pa.1975) (same). While Philadelphia claims that the legislature could no longer abolish the City entirely, the extent to which the Pennsylvania legislature may restrict Philadelphia's powers is best examined under state law.

### 2. Pennsylvania Constitution

#### a. Municipal power may be revoked under the Pennsylvania Constitution

The legislature may contract the power of home rule municipalities such as Philadelphia. Therefore, to the extent that Philadelphia could ever sue in a governmental capacity for negligence and public nuisance, the legislature properly revoked that power. The Pennsylvania Constitutions provides, "A municipality which has a home rule charter may exercise any power or perform any function *not denied* by this Constitution, by its home rule charter or *by the General Assembly* at any time." PA. CONST. art. IX § 2 (emphasis added); *see also Ortiz v. Commonwealth,* 545 Pa. 279, 681 A.2d 152, 156 (1996). Thus, the

Constitution makes the mass of municipal power a matter for the legislature to expand or contract. This realization must precede any notion of municipal "rights" against the state legislature.

The City's instant suit is, in reality, an application of power which has been primarily entrusted to the state, and which the state may reclaim at its discretion. I have already explained why the instant suit amounts to a regulation—a classic display of governmental power. *See Geier,* 529 U.S. at ——, 120 S.Ct. at 1925; *Int'l Paper Co.,* 479 U.S. at 495, 107 S.Ct. 805; *New York Times,* 376 U.S. at 265, 84 S.Ct. 710. This is particularly true in this suit. The City pursues negligence and public nuisance claims on behalf of the citizens of Philadelphia. In other words, it has admitted that one of the bases for its negligence suit is its parens patriae power. As the U.S. Supreme Court noted:

> The concept of parens patriae is derived from the English constitutional system. As the system developed from its feudal beginnings, the King retained certain duties and powers, which were referred to as the "royal prerogative." The powers and duties were said to be exercised by the King in his capacity as "father of the country"... In the United States, the "royal prerogative" and the "parens patriae" function of the King passed to the *States.*

*Hawaii v. Standard Oil Co.,* 405 U.S. 251, 257, 92 S.Ct. 885, 31 L.Ed.2d 184 (1972) (emphasis added); *Nat'l Wood Preservers v. Commonwealth,* 489 Pa. 221, 414 A.2d 37, 42–43 (1980); *Commonwealth v. Phillip Morris, Inc.,* 736 A.2d 693 (1999) (Kelley, J. dissenting) (discussing basis for suit brought by Pennsylvania Attorney General against tobacco industry); *Ganim v. Smith & Wesson Corp.,* No. CV 990153198S, 1999 WL 1241909 at * 4–5, notes 5–6 (Conn.Super.Ct. Dec. 10, 1999).

---

**7.** The City also challenges the 1999 UFA Amendment under the "separation of powers" doctrine. I presume the City meant to refer to the division between Pennsylvania law makers and the courts, and not Articles I and III of the United States Constitution. *See* U.S. CONST. arts. I, III (outlining powers of Congress and the federal courts). A discussion of the separation of powers under Pennsylvania law can be found below.

Similarly, the public nuisance claim also seeks to exert traditional state power. The first public nuisance suits were encroachments on the royal domain or public highways. *See* RESTATEMENT (SECOND) OF TORTS § 821B cmt. a (1979). By analogy, the right to sue for public nuisance also passed to the states and to their surrogates. States, in turn, delegated some of the responsibility for pursuing such claims to the cities. *See* H.G. WOOD, A PRACTICAL TREATISE ON THE LAW OF NUISANCES 770–72 (1875). Professor Wood, whom the plaintiffs described as "the leading authority on 19th Century nuisance law," Resp. in Opp. at 15, stated:

> A municipal corporation derives all of its powers from the legislature. It may do any act which it is authorized to do by that body, within the constitutional exercise of its powers, and all acts that are fairly and legitimately incident to the powers granted, but it cannot lawfully go beyond that point ... The charter, and special acts in addition thereto, if there are any, are the measure of power, and, when it exceeds those powers, its acts are unlawful, unwarranted, and afford no protection whatever to those acting under them. ¶ Therefore, a municipal corporation has no control over nuisance existing within its corporate limits except such as is conferred upon it by its charter or by general law.

*Id.* at 770–71. Accordingly, the City's suit is based on power it received from the Commonwealth. The legislature may properly restrict such municipal exercises of traditional state power. *See id.*

The City argues that the legislature may not revoke such power at this point because preventing the city from suing the gun industry would violate "due process"

and the Pennsylvania "separation of powers" doctrine. Primarily, the City relies on *Gibson v. Commonwealth*, 490 Pa. 156, 415 A.2d 80 (1980). An examination of *Gibson* demonstrates why the City's argument is infirm. In *Gibson*, a dam overflowed during a heavy rainstorm and flooded the downstream town. *See id.* at 81. The plaintiffs were individuals who sought to sue the Commonwealth for its negligent supervision of a dam. *See id.* At the time of the suit, sovereign immunity had been abolished by the courts, and the legislature had not yet reenacted sovereign immunity by statute. *See id.* The legislature then passed the Political Subdivision Tort Claims Act, 42 PA. CONS.STAT.ANN. § 5110 *et seq.*, with a provision explicitly applying the Act to claims which arose before the statute was enacted. The Pennsylvania Supreme Court declined to give the statute a retroactive effect, finding that the legislature could not eliminate an individual's rights which had accrued under existing law. The court relied on the Due Process Clause of the Fourteenth Amendment, the Open Courts Clause of the Pennsylvania Constitution, PA. CONST. art. I § 11,[8] and the separation of powers doctrine. *See id.* at 160–164, 415 A.2d 80.

However, nothing in *Gibson* suggests that its rule was meant to restrict the legislature when apportioning state power to municipalities. The *Gibson* Court was rightly concerned about encroachments by the legislature on judicial power in "cases of disputed *right*, and that [the courts] shall administer justice 'by the law of the land' and 'by due course of law.'" *Id.* at 161, 415 A.2d 80. The issue here is not whether the legislature eliminated a *right* or *remedy*. Rather, the question is whether the legislature acted within its preroga-

---

**8.** The Open Courts Clause provides in relevant part: "All courts shall be open; and every man for an injury done him in his lands, goods, person, or reputation shall have remedy by due course of law, and right and justice administered without sale, denial, or delay." PA. CONST. art. I, § 11. *See also* Jack B. Harrison, *How Open Is Open? The Devel-*

*opment of The Public Access Doctrine Under State Open Court Provisions*, 60 U.CIN.L.REV. 1307, 1312 (1992) (discussing history of the guarantee of access to the courts from the Magna Carta through William Penn's incorporation of the right into Pennsylvania's first charter in 1682 C.E.).

tive, secured by constitutional text, to restrict Philadelphia's parens patriae power or to reign in Philadelphia's power to prosecute perpetrators of public nuisance. It did. *See* PA. CONST. art. IX § 2; *Ortiz v. Commonwealth*, 545 Pa. 279, 681 A.2d 152, 156 (1996). The City cannot limit the legislature's power by seeking refuge in Pennsylvania's Bill of Rights. To expand the rights of political entities is to aggrandize their power. *See Texas Workers' Compensation Comm'n v. Bridge City*, 900 S.W.2d 411, 414 (Tex.App.1995) (cities cannot use the sword of due process of law and other provisions of a state constitution's Bill of Rights to invalidate the laws that govern them).

The legislature's action accords with other cases in which municipalities have filed suit against the gun industry. In *Ganim v. Smith & Wesson Corp.*, No. CV 990153198S, 1999 WL 1241909 (Conn.Super.Ct. Dec. 10, 1999), a court dismissed such a suit finding that the municipality had no statutory or common law authority to recover expenditures. *See id.* at *5–6. The court reasoned that when deciding whether a municipality has statutory authority for a certain action, one first looks for statutory authority to justify the city's action. *See id.* at *6.

The only court to conclude that the state lacks the authority to abrogate a city's suit against the gun industry did so pursuant to the vagaries of that state's constitutional doctrine. *See Morial v. Smith & Wesson*, 98–18578, 2000 WL 248364, at *2–3 (La.Civ.D.Ct. Feb. 28, 2000). Louisiana's high court had ruled that the Home Rule provision in its state constitution required the city's powers to be broadly construed, and preserved any powers the city had. *See id.* (citing *Francis v. Morial*, 455 So.2d 1168 (La.1984)). Accordingly, the state of Louisiana could not revoke a home rule charter function. *See id.* The Louisiana legislature may not be able to abrogate municipal power, but PA. CONST. art. IX § 2 explicitly grants the Pennsylvania legislature that ability.

### b. The City had no "accrued" causes of action for negligence or public nuisance

In addition, the Pennsylvania constitution only prohibits the abolition of causes of action which have "accrued" under state law. *See Gibson*, at 161, 415 A.2d 80. As I shall explain in more detail below, *infra* sections IV–V, the facts here do not create a claim for public nuisance or negligence. Accordingly, the 1999 UFA Amendment did not abolish an existing cause of action when it prohibited the City from suing the gun manufacturers.

### D. Municipal Cost Recovery Rule

■ The City has also argued that in addition to suing in its governmental capacity to abate a public nuisance, it seeks reimbursement for direct harm related to gun violence. Complt. at ¶ 2, 79. In particular, the City seeks reimbursement for:

> public funds expended for prevention and limitation of access to handguns by persons intent on crime or prohibited to purchase or possess [them] under Pennsylvania or federal law; the costs or responding to resulting incidents of handgun violence and crime; the costs of dealing with resulting deaths and injuries' and the costs of the resulting, substantially enlarged criminal justice administration.

Cmplt. at ¶ 79.

Recovery on this basis would be barred by the municipal cost recovery rule. *City of Pittsburgh v. Equitable Gas Co.*, 98 Pa.Cmwlth. 523, 512 A.2d 83, 84 (1986) ("*Equitable Gas*"); *City of Flagstaff v. Atchison, Topeka & Santa Fe Railway Co.*, 719 F.2d 322 (9th Cir.1983). Pennsylvania's Commonwealth Court specifically stated, "The cost of public services for protection from a safety hazard is to be borne by the public as a whole, not assessed against a tortfeasor whose negligence creates the need for the service." *Equitable Gas*, 512 A.2d at 84. At least three courts have already held that the

municipal cost recovery rule bars cities' suits against the gun industry. *See, e.g., City of Cincinnati v. Beretta U.S.A. Corp.,* No. C–990729, 2000 WL 1133078, at *9–10 (Ohio Ct.App. Aug. 11, 2000); *Penelas v. Arms Tech., Inc.,* No. 99–1941 CA–06, 1999 WL 1204353, *2 (Fla.Cir.Ct. Dec. 13, 1999); *Ganim v. Smith & Wesson Corp.,* No. CV 990153198S, 1999 WL 1241909, at *4 n. 6 (Conn.Super.Ct. Dec. 10, 1999); *see also* Anne Giddings Kimball, *Municipal Firearm Litigation: Ill Conceived from Any Angle,* 32 CONN.L.REV. 1277, 1296–1301 (2000) (discussing how municipal suits against gun manufacturers are barred from recovering usual costs of policing cities). The City made no argument against the applicability of the municipal cost recovery rule to its negligence claim, nor could it. The City routinely provides police and law enforcement to protect its citizens from criminals who use guns and some health services to victims of youth firearm violence. These unquestionably are municipal costs which cannot be recovered.

Instead, the City restricted its argument around the municipal cost recovery rule to its public nuisance claim, asserting that the rule is inapplicable in such suits. The City cannot have it both ways: if it sues in its governmental capacity, it is prevented from doing so by the legislature. If it sues for costs it has itself incurred due to gun violence, the action is barred under the municipal cost recovery rule.

## II. THE ORGANIZATIONAL PLAINTIFFS LACK STANDING [9]

As a threshold question, a federal court must rule on whether a plaintiff has standing to sue. *See Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). Because the U.S. Constitution restricts federal court jurisdiction to actual cases and controversies, a plaintiff must have standing for a court to have the power to entertain the suit. *See id.* (citing U.S. CONST. art. III). In addition, jurisdiction should not be exercised when the asserted harm is a grievance shared in substantially equal measure by all of a large class of citizens. *See id.* at 499, 95 S.Ct. 2197. A plaintiff cannot rest its claim to relief on harm done to third parties. *See id.* Standing and other jurisdictional limits are important because they demarcate the boundaries between the judiciary and the other political bodies:

> Without such limitations—closely related to Art. III concerns but essentially matters of judicial self-governance—the courts would be called upon to decide abstract questions of wide public significance even though other governmental institutions may be more competent to address the questions and even though judicial intervention may be unnecessary to protect individual rights.

*Id.* at 500, 95 S.Ct. 2197. The standing requirement forces courts to look at whether a person in the plaintiff's position has a right to judicial relief. *See id.*

▮▮▮▮ Organizations or associations may only have standing to redress injury to the organization itself or for wrongs done to its members. *See Warth,* 422 U.S. at 511, 95 S.Ct. 2197. An organization has "associational standing," or the right to sue on behalf of its members, when: (a) the organization's members would have standing to sue in their own right; (b) the interests it seeks to vindicate are germane to the organization's purpose; (c) neither the claim nor the relief sought requires the participation of individual members. *See Hunt v. Washington Apple Adver. Comm'n,* 432 U.S. 333, 344, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977); *Public Interest*

---

**9.** At this point, I am addressing the organizational plaintiff's Article III standing pursuant to Fed.R.Civ.P. 12(b)(1). The plaintiffs' failure to state a cause of action because of a lack of "standing" under the remoteness doctrine will be discussed *infra,* section IV.B.1. *See*

*Maio v. Aetna Inc.,* 221 F.3d 472, 482 n. 7 (3d Cir.2000) (compiling cases; distinguishing between dismissal pursuant to 12(b)(1) for lack of constitutional standing and dismissal pursuant to 12(b)(6) for lack of standing under RICO or antitrust law).

*Research Group of New Jersey, Inc. v. Magnesium Elektron, Inc.*, 123 F.3d 111, 119 (3d Cir.1997) ("M.E.I."); *Public Interest Research Group of New Jersey, Inc. v. Powell Duffryn Terminals, Inc.*, 913 F.2d 64, 70 (3d Cir.1990).

## A. The organizational plaintiffs lack standing

■ The organizational plaintiffs and their members [10] have standing if they pass a tripartite test devised by the U.S. Supreme Court:

> [T]o satisfy Article III's standing requirements, a plaintiff must show (1) it has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Friends of the Earth v. Laidlaw Envt'l Servs.*, 528 U.S. 167, 120 S.Ct. 693, 704, 145 L.Ed.2d 610 (2000) ("Laidlaw Environmental Services"); *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (citations omitted); *Valley Forge Christian College v. Americans United for the Separation of Church and State*, 454 U.S. 464, 472, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982); *Fair Hous. Council v. Main Line Times*, 141 F.3d 439, 441 (3d Cir.1998).

■ For the purposes of this opinion, plaintiffs have satisfied the first and third prongs of *Laidlaw Environmental Services* in that they have alleged an injury in fact which could (potentially) be redressed

with a favorable decision. However, they cannot establish the 'fair traceability' or 'causal nexus between the defendants' conduct and their alleged injuries necessary to have standing in their own right or on behalf of their members. *See Laidlaw Envt'l Svcs.*, 528 U.S. at ——, 120 S.Ct. at 704. "Fair traceability," the second prong of the standing test in *Laidlaw Envt'l Svcs.*, requires a "substantial likelihood" that the defendant's conduct caused injury to the plaintiff. *Powell Duffryn*, 913 F.2d at 71–72 (citing *Duke Power Co. v. Carolina Envt'l Study Group, Inc.*, 438 U.S. 59, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978)). It has been said that the plaintiffs need not show causation to a scientific certainty or to the satisfaction of tort-law causation standards. *See id.* Thus, in *Powell Duffryn*, the Third Circuit found that an environmental group whose members used a riverside park had standing to sue a company which leaked chemicals into the river upstream. *See Powell Duffryn*, 913 F.2d at 72. The chemicals flowed without interruption, albeit by a circuitous route, from the Powell Duffryn plant to the plaintiff's locale. *See id.* No third parties were alleged to have facilitated or exacerbated the harm, making a finding of standing appropriate. This follows the Supreme Court: the harm to the plaintiff cannot be the "result [of] independent action of some third party not before the court." *Lujan*, 504 U.S. at 560, 112 S.Ct. 2130.

There is a tempting parallel between standing for environmental tort victims and the justiciability of the current case decrying gun manufacturers's distribution practices. In both, a defendant places a potentially harmful commodity into a

---

**10.** For the purposes of associational standing, an organization's members include those individuals which possess "indicia of membership." *M.E.I.*, 123 F.3d at 119 (citing *Hunt*, 432 U.S. at 344, 97 S.Ct. 2434). Non-members possess indicia of membership if they possess a franchise in the choice of the organization's board, are qualified to serve on the board, and finance its activities. *Hunt*, 432 U.S. at 344, 97 S.Ct. 2434; *M.E.I*, 123 F.3d at

119; *Friends of the Earth v. Chevron Chem. Co.*, 129 F.3d 826 (5th Cir.1997). Here, the organizational plaintiffs· claim to represent the interests of a select number of police officers, Latino youth and parents, public housing councils, as well as students and parents of Northeast High School. Anyone served by these groups would possess sufficient indicia of membership. *M.E.I.* at 119.

"stream"—one literal, the other of commerce.

This superficial analogy ends at the very start. Polluters violate the law as soon as their toxins enter a waterway. *See Powell Duffryn,* 913 F.2d at 68; *M.E.I.,* 123 F.3d at 114. Once in a watercourse, toxins move downstream by force of nature. The human role ends with the act of pollution. Here, in contrast, the gun manufacturers' products lawfully enter into the stream of commerce. Illegal conduct and harm to the plaintiffs only occurs because of several intervening actions by independent individuals: the federally licensed dealer must sell the gun; the straw buyer must resell it; the criminal must use it. None of these are natural consequences of the gun manufacturers' distribution scheme.

It is also disturbing that the organizational plaintiffs argue that they may sue for the costs of educational sessions and other programs which they run to counteract gun violence. By this logic, any social action organization may confer standing upon itself by voluntarily spending money on the social problem of its choice. Analogously, the environmentalist group in *Lujan* would have standing to protest the endangerment of wildlife in Sri Lanka simply by running programs to preserve foreign fauna. This would be a novel and vast expansion of associational liability for which plaintiffs have advanced no precedential support. It also contradicts the prudential concern behind the standing doctrine that courts not become vehicles for the advancement of ideological and academic agendas. *See Warth,* 422 U.S. at 500, 95 S.Ct. 2197.

**B. Germaneness**

Each of the organizational plaintiffs has alleged that its members are harmed by gun violence in Philadelphia. See Cmplt. at ¶¶ 3–7. While the point is arguable, I find that the plaintiffs have sufficiently alleged a goal "germane to [its organizational] purpose." *Hunt,* 432 U.S. at 344, 97 S.Ct. 2434.

**C. Participation of individual members**

To the extent that the members of the organizational plaintiffs actually have sustained damages, those members are the proper plaintiffs in a suit for monetary compensation. This action cannot proceed in their absence. Courts give considerable leeway in allowing an organization to seek an injunction on behalf of its members, because the equitable remedy will inure to all members of the group. *Warth v. Seldin,* 422 U.S. 490, 515, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). However, a suit for damages differs significantly because:

> The damages claims are not common to the entire membership, nor shared by all in equal degree. To the contrary, whatever injury may have been suffered is peculiar to the individual member concerned, and both the fact and extent of injury would require individualized proof. Thus, to obtain relief, each member of [the plaintiff association] who claims injury as a result of [defendants'] practices must be a party to the suit, and the [plaintiff association] has no standing to claim damages on his behalf.

*Id.* at 515, 95 S.Ct. 2197.

None of the plaintiffs are individual members of the organizations.[11] To date,

---

11. The court notes that the instant suit was in contemplation for at least eighteen months before the plaintiffs filed the instant complaint. *See* Craig R. McCoy & Clea Benson, *Philadelphia Mayor Prepares to Sue Gun Industry for Cost of Violence,* PHILA. INQUIRER, Jan. 9, 1998, *available at* LEXIS, News Library, Philadelphia Inquirer File. Plaintiffs had ample time to research possible individual plaintiffs for the lawsuit, but evidently chose not to add them as plaintiffs. In any event, it is difficult to see how resolution of the present case would preclude possible future claims by individuals against appropriate individual defendants. *See CoreStates Bank, N.A. v. Huls America, Inc.,* 176 F.3d 187, 194 (3d Cir.1999) (requiring participation of the same parties or their privies for application of claim preclusion).

the plaintiffs have not filed a motion to join any individuals as new plaintiffs, nor does the docket reflect that anyone has tried to intervene.

Thus, I am compelled to dismiss the plaintiffs' claims for lack of standing because of their failure to satisfy all three necessary elements of associational standing enunciated in *Warth*.

## III. ROLE OF A TRIAL COURT IN DEVELOPING NEW LAW

Even assuming, for present purposes, that the City could sue and that the organizational plaintiffs do have standing, they still could not prevail in this action as a matter of law.[12] To lend credence to their novel legal theories, plaintiffs categorize their claims for negligence and public nuisance as traditional state causes of action. But current negligence and public nuisance law are not nearly as malleable as they suggest. Trial courts should be circumspect before creating rights *ex nihilo*. Judge Learned Hand once observed, it is not "desirable for a lower court to embrace the exhilarating opportunity of anticipating a doctrine which may be in the womb of time but whose birth is distant." *Spector Motor Service v. Walsh*, 139 F.2d 809, 823 (2d Cir.1943) (Hand, J., dissenting).

## IV. THE PLAINTIFFS HAVE FAILED TO STATE A CLAIM GROUNDED IN NEGLIGENCE OR NEGLIGENT ENTRUSTMENT

Plaintiffs have also failed to allege sufficient facts to make a claim for negligence. The elements of a negligence claim include: a legal duty, a breach of that duty, a causal relationship between the defendant's negligence and plaintiff's injuries, and damages. *See Martin v. Evans*, 551 Pa. 496, 711 A.2d 458, 461 (1998); *Morena v. S. Hills Health Sys.*, 501 Pa. 634, 462 A.2d 680 (1983). For the reasons outlined below, no legal duty exists upon these

defendants to protect citizens from the deliberate and unlawful use of their products. In addition, the lack of proximate cause bars recovery as a matter of law.

### A. Lack of Legal Duty

#### 1. Negligence

■■ Foremost among the requirements for a negligence tort is the requirement that the defendant owe a legally recognized duty of care to the plaintiff. *See Althaus v. Cohen*, 562 Pa. 547, 756 A.2d 1166, 1168 (2000); *Gibbs v. Ernst*, 538 Pa. 193, 647 A.2d 882, 890 (1994). The question of whether or not gun manufacturers have a legal duty to cities and to individual victims of gun violence inflicted by a non-defective weapon has generated a great debate among various courts. In a recent case before the Pennsylvania Supreme Court, a person injured by a non-defective firearm sought to impose liability on manufacturer of that gun, but the court declined to address the issue of liability on appeal. *See Haines v. Raven Arms*, 536 Pa. 452, 640 A.2d 367, 369 n. 1 (1994). No reported decision by a Pennsylvania court directly discusses whether liability would arise from these facts.

Most courts which have considered this issue have concluded that no duty exists. *See First Commercial Trust Co. v. Colt's Mfg. Co.*, 77 F.3d 1081 (8th Cir.1996); *Bubalo v. Navegar, Inc.*, No. 96C3664, 1997 WL 337218, 1997 U.S. Dist. LEXIS 8551, *25–26 (N.D.Ill. June 13, 1997) ("Bubalo I") *modified in part by Bubalo v. Navegar, Inc.*, No. 96C3662, 1998 WL 142359, 1998 U.S. Dist. LEXIS 3598 (N.D.Ill.1998) ("Bubalo II"); *Patterson v. Rohm Gesellschaft*, 608 F.Supp. 1206 (N.D.Tex.1985); *Riordan v. Int'l Armament Corp.*, 132 Ill. App.3d 642, 87 Ill.Dec. 765, 477 N.E.2d 1293, 1295 (1985) (citing *Linton v. Smith & Wesson*, 127 Ill.App.3d 676, 82 Ill.Dec. 805,

---

12. I retain jurisdiction over the City's claims for public nuisance or negligence. Above, I rejected the City's constitutional challenge, in part, because they had no accrued causes of action. *See supra* section I.C.2. I now explain why there is no nuisance or negligence claim against the defendants.

469 N.E.2d 339 (1984); *Archer v. Arms Tech., Inc.,* No. 99–912658 (Mich.Cir.Ct. filed May 16, 2000) (slip op.); *City of Cincinnati v. Beretta U.S.A. Corp.,* No. C–990729, 2000 WL 1133078, at *9–10 (Ohio Ct.App. Aug. 11, 2000)). *But see Hamilton v. Accu–Tek,* 62 F.Supp.2d 802, 825 (E.D.N.Y.1999) (currently certified to New York Court of Appeals); *Merrill v. Navegar, Inc.,* 75 Cal.App.4th 500, 89 Cal. Rptr.2d 146 (1999) *superseded by grant of petition for review* 92 Cal.Rptr.2d 256, 991 P.2d 755 (Cal.2000); *City of Boston v. Smith and Wesson Corp.,* No.1999–02590, 2000 WL 1473568 (Mass.Super. July 13, 2000) (slip op.).

▉▉▉ In Pennsylvania, whether a duty exists is a matter of law. *Althaus,* 756 A.2d at 1169. The Supreme Court of Pennsylvania has recently set forth a five factor test to determine whether sound policy dictates that a particular plaintiff is entitled to protection, including: "(1) the relationship between the parties; (2) the social utility of the actor's conduct; (3) the nature of the risk imposed and foreseeability of the harm incurred; (4) the consequences of imposing a duty upon the actor; (5) and the overall public interest in the proposed solution." *Id.*

### a. Relationship between the parties

Here, the lack of a relationship between the parties militates against finding a legal duty of care. *See Althaus,* 756 A.2d at 1169–70. The defendant gun manufacturers share only the most tenuous relationship with the city or the organizational plaintiffs. According to the allegations of the complaint, the defendants are several steps removed from any contact with the plaintiffs: the defendants ship their legal products to distributors who sell them to federal firearm licensees. In turn, the licensees may sell them to otherwise legal purchasers who independently commit crimes or unlawfully sell to others who commit shootings. Complt. at ¶¶ 31–60. The City and the organizational plaintiffs only have standing to sue (if at all) by stepping into the shoes of victims, or by paying for response and support services on their behalf.

### b. Social utility

The plaintiffs argue that the social value of defendants' legal distribution of firearms is undercut by the harm done to city residents. For this contention, plaintiffs rely primarily on *Suchomajcz v. Hummel Chem. Co.,* 524 F.2d 19 (3d Cir.1975). In *Suchomajcz,* the Third Circuit found the defendant, although making legal sales, was alleged to have actually known of illegal resales by its vendee and several court injunctions against the vendee forbidding those resales. *See id.* 23–25. In that situation, the Third Circuit found the social utility of the defendant manufacturer's sales was undercut by the vendees' known illegal sales. *See id.* at 25. Therefore, the court impressed a legal duty upon the manufacturer toward third parties injured as a result of the firecrackers it sold. *See id.* at 25. Here, in contrast, more than 99% of the gun maker's vendees transact their business lawfully and do not routinely sell guns to "straw buyers."

Indeed, public policy would seem to be opposed to a duty on gun manufacturers to police the federally licensed firearms dealers. When given the opportunity, the legislature has refused to extend liability into the area which the City proposes. *See* 18 PA. CONS.STAT.ANN. § 6120(a.1) (West 1999). In addition, the gun industry is already under heavy regulation and a carefully calibrated statutory scheme at the federal and state levels. *See* 18 U.S.C. § 921 *et seq.* (2000) (establishing licensing system and other regulations for interstate firearms sales); 27 C.F.R. § 178–179; 18 PA. CONS.STAT.ANN. § 6101 *et seq.* (West 1999) (Pennsylvania Uniform Firearms Act). In particular, Pennsylvania makes it a felony to directly sell guns to a specified group of prohibited purchasers. *See id.* at § 6125. Thus, Congress and the Pennsylvania legislature has already made its determination of which firearms transactions it deems socially useful.

In urging the court to recognize a duty, the plaintiffs, at oral argument, analogized the current case to dram shop suits. Trans. Oral Arg. at 57. Plaintiffs assert that just as the licensed barkeep who provides alcohol to the visibly drunk may be found liable, so too gun manufacturers should be held accountable for providing weapons to dealers who they 'know' will resell the guns. The analogy fails for a simple reason: dram shop liability was established by statute, not by the courts. *See* 47 P.S. § 4–497 (West 1997) (establishing and defining scope of liability of licensed alcohol vendors); *see also* Jason G. Bates, Recent Decision, 3 Duq.L.Rev. 793, 797 (1995).

### c. Harm and Foreseeability [13]

Forseeability cannot be based on speculation upon future actions of individual purchasers of firearms from legally licensed independent dealers not employed by the defendants herein. *Compare Novak v. Jeannette Dist. Mem'l Hosp.*, 410 Pa.Super. 603, 600 A.2d 616, 618 (1991) (holding that foreseeability of harm must be based on more than mere speculation). In addition, "when the consequence of the negligent act is no longer *reasonably* foreseeable, the passage of time and the span of distance mandate a cut-off point for liability." *Brown v. Philadelphia College of Osteopathic Med.*, 760 A.2d 863, 869 (2000) (emphasis supplied; internal quotes omitted). The Pennsylvania Supreme Court recently refused to enlarge the scope of foreseeability in another context, explaining:

> Yes, one can reason in so many instances that an extension of liability is merely a small step flowing naturally and logically from the existing case law. Yet each seemingly small step, over time, leads to an ever proliferating number of small steps that add up to huge leaps in terms of extension of liability. At some

point it must stop and I would draw the line in this area of the law with what is expressed by the court in this case—no further.

*Estate of Witthoeft v. Kiskaddon*, 557 Pa. 340, 733 A.2d 623, 630 (1999) (quoting *Emerich v. Philadelphia Ctr. for Human Dev., Inc.*, 554 Pa. 209, 720 A.2d 1032, 1045 (1998) (Flaherty, C.J., concurring)).

Thus, Pennsylvania courts have taken a restrictive approach to imposing liability upon defendants who are absent at the time of the actual injury where other adults are present who could have acted responsibly to prevent the harm. For instance, in *Neyman v. Soutter*, 205 Pa.Super. 8, 205 A.2d 685 (1964), the court found no duty on the part of a gun owner whose adult son used the gun to shoot a person in the arm, despite evidence in the record that the gun wielder was "irresponsible" and had previously taken the weapon out and used it. The Superior Court found no evidence indicating the adult son would misuse the weapon. *Neyman*, 205 A.2d at 687. Specifically, it found the defendant allegedly in control of the weapon did not know "[the shooter] intended or was likely to use the gun in such a manner as to create an unreasonable risk of harm to others." *Id.* Therefore, it concluded, the defendant owed no duty to the gunshot victim and reversed a verdict in the plaintiff's favor. *See id.*

In a similar vein, the Superior Court recently limited the liability for a mother whose son was in the custody of his father when their son shot another child with an air gun. *See J.H. v. Pellak*, 2000 PA Super. 375 (Dec. 6, 2000). In *J.H.*, a child shot another child with an air gun while in the custody of his father. *See id.* at ¶ 2. The injured child sued his assailant's mother, although she did not have custodial control over her son at the time of the

---

13. While the degree of harm which the plaintiffs allege weighs toward imposing the duty, this factor may be outweighed by the lack of foreseeability of that harm. *Althaus*, 756

A.2d at 1166. Therefore, the court will concentrate its analysis on the foreseeability component of this factor.

shooting. *See id.* at ¶ 5. The Superior Court held the non-custodial mother was not liable, reasoning that she had no reason to know of the need to exercise control her child and lacked the ability and opportunity to exercise parental control. *See id.* at ¶ 12. The court pointed to the fathers actions: he had purchased the air gun and gave his son permission to use it. *See id.* at ¶ 13.

In so holding, the Superior Court distinguished *Frey v. Smith,* 454 Pa.Super. 242, 685 A.2d 169 (1996), where another child injured a person by shooting an air gun. *J.H.* at ¶ 15. The court found that both of the parents in *Frey* had the opportunity to intervene and prevent the unsupervised use of the air gun by their son, whereas the mother in *J.H.* neither knew of the air gun nor was she in a position to prevent her child from using it. *See id.*

The logic of *Neyman* and *J.H.* extend to the instant dispute. The gun manufacturers supply their products to adult, independent federally licensed firearms dealers. The defendants are not in control of the guns at the time they are misused, nor do they control the independent firearms dealers. The City's sole allegation of control: that the gun manufacturer do not adopt policies which would place restrictions on the activities of the federally licensed firearms dealers, *see* Cmplt. at ¶ 17, is a form of control which neither the *Neyman* nor *J.H.* court adopted. Indeed, the defendant mother in *J.H.* maintained a close, familial relationship with the shooter—a much closer relationship than that alleged between the gun manufacturers and straw purchasers and criminals. Similarly, the knowledge of potential misuse cannot be implicated to the gun manufacturers as a matter of law.

The cases which the City cites in support are distinguishable. In each, the defendant had *immediate* knowledge of impending misuse of their product. In *Kuhns,* the grandfather left a loaded pistol in his dresser drawer. *See Kuhns v. Brugger,* 390 Pa. 331, 135 A.2d 395, 399

(1957). One of his grandchildren found the pistol, and, while playing with the gun, shot his cousin in the spinal cord. *See id.* at 399. The court sustained a jury verdict, finding the grandfather could be liable. *See id.* at 403. While the court did say that the grandfather owed an extraordinary duty of care, it limited it to those particular circumstances, where the grandfather left a loaded gun in the house where children could have access to it, and where the defendant knew the children knew of the gun's existence. *See id.* at 403.

In another case which plaintiffs cite, the defendant manufacturer supplied fireworks to a company and was alleged to have known that its buyer had illegally sold fireworks assembly kits and in violation of federal court injunctions. *Suchomajcz,* 524 F.2d at 23. The Third Circuit found that the plaintiff had alleged sufficient facts to survive summary judgment, explicitly relying on the specific knowledge which the fireworks manufacturer possessed. *See id.* at 23, 25.

Lastly, the plaintiffs rely on a case in which negligence was not at issue. *Direct Sales Co. v. U.S.,* 319 U.S. 703, 63 S.Ct. 1265, 87 L.Ed. 1674. In *Direct Sales,* The U.S. Supreme Court upheld a conspiracy conviction against a corporation which supplied morphine tablets to a pharmacist who illegally dispensed them. *Id.* at 706–07, 63 S.Ct. 1265. The manufacturer, who sold narcotics to pharmacists via mail order, was informed by the FBI that it was being used as a source for convicted physicians, and the FBI had made repeated recommendations to decrease potential illegal distribution. *Id.* at 707, 63 S.Ct. 1265.

The defendant in *Direct Sales* was not prosecuted for every shipment of morphine which it sold to a convicted felon, nor was every mail order drug company being prosecuted. Rather, the government prosecuted one particular company for sales to one particular buyer after the FBI had notified it that its direct customers were

illegally reselling their product, and the FBI had recommended a course of conduct to abate that possibility. *See Direct Sales,* 319 U.S. at 703, 63 S.Ct. 1265. The manufacturer actually modified its sales practices to evade the restrictions the government sought to impose. *See id.*

The facts of those cases are materially different than the facts which the court faces here. First, the distribution scheme is not only lawful, it is prescribed by statute. Gun manufacturers lawfully ship their guns to independent federally licensed distributors and dealers. Only then do a small fraction of those independent dealers then resell those weapons to individuals unable to lawfully possess firearms. Cmplt. ¶ 27(a). Furthermore, the gun manufacturers are not alleged to have deliberately sought to defeat law enforcement recommendations to prevent illegal sales.

The actual injuries to the plaintiffs are too speculative, and too separated by distance and time from any conduct of the defendants. Accordingly, the defendant gun manufacturers cannot be said to have foreseen that their weapons would be illegally sold and used in crimes.

#### d. Consequences to defendants

Among the factors to be considered for the imposition of a legal duty is the potential adverse consequences to the defendant. Here, the defendant would be forced to incur greater costs to pay for monitoring the distribution of firearms. Because increased costs to the defendant is standard in any tort action, this factor would weigh in favor of the imposition of a duty. However, as seen herein, this factor is outweighed by the other four.

#### e. Overall public interest in proposed solution

The City's proposed solution would not serve the public interest. There may be a great deal of public support for placing the financial burden for gun violence in Philadelphia upon the gun industry. But the court must focus on the narrower issue presented here: industry-wide liability for every gunshot wound in the city which can be 'reasonably' attributed (in part) to the defendants' distribution and sales practices. Plaintiffs' proposed solution sweeps too broadly.

The court's refusal to adopt a new legal duty does not foreclose the possibility that alternative suits might succeed. *Althaus v. Cohen,* 562 Pa. 547, 756 A.2d 1166, 1171. Individual plaintiffs victimized by guns in inappropriate hands may still sue their shooters. Perhaps they might even sue the dealer who sold the shooter his or her weapon. The City may still sue (and the District Attorney may still prosecute) rogue firearms dealers who sell to felons and others unlawfully allowed to possess firearms. *See* 18 PA. CONS.STAT.ANN. § 6125 (West 1999). But the recognition of the legal duty for manufacturers to victims of gun violence is a matter properly addressed to Congress or the Pennsylvania Legislature.

In sum, most factors militate against the imposition of a duty on the gun industry to supervise the distribution of its weapons. Therefore, I find Pennsylvania law would not impose a duty upon the gun industry to modify its marketing and distribution practices. *See also, Riordan v. Int'l Armament Corp.,* 132 Ill.App.3d 642, 87 Ill. Dec. 765, 477 N.E.2d 1293, 1295 (1985) (no duty under Illinois law for gun manufacturer to monitor distribution of its weapons).

#### 2. Negligent Entrustment

██ Plaintiffs have also failed to allege facts sufficient to sustain a claim for negligent entrustment. To define negligent entrustment, Pennsylvania has adopted the Restatement (Second) of Torts:

It is negligence to permit a third person to use a thing or to engage in an activity which is under the control of the actor, if the actor knows or should know that such person intends or is likely to use

the thing or to conduct himself in the activity in such a manner as to create an unreasonable risk of harm to others. *Ferry v. Fisher*, 709 A.2d 399, 403 (Pa.Super.Ct.1998) (quoting RESTATEMENT (SECOND) OF TORTS § 308 (1979)). The plaintiffs have not alleged that the gun manufacturers directly entrust their weapons to individuals who are likely to use them in a negligent or criminal way. For reasons discussed more fully in other section of this opinion, any other allegation of knowledge is pure speculation. *See supra*, section IV.A.1.c.; *see infra* IV.B.

**B.  Lack of Proximate Cause—Remoteness**

■ In addition, plaintiff's claims for both negligence and for negligent entrustment must fail for lack of proximate cause. *See Vattimo v. Lower Bucks Hosp.*, 502 Pa. 241, 465 A.2d 1231, 1233 (1983) (requiring proximate cause for negligence claim); *Frey v. Smith*, 454 Pa.Super. 242, 685 A.2d 169, 173 (1996) (requiring proximate cause for negligent entrustment claim).[14]

Under Pennsylvania law, the plaintiffs cannot recover because their injuries are too remote from the defendants' alleged wrongful conduct. *See Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris, Inc.*, 171 F.3d 912, 937 n. 23 (3d Cir.1999) (applying remoteness analysis under antitrust and RICO remoteness doctrine to uphold dismissal of negligence claim); *Liney v. Chestnut Motors, Inc.*, 421 Pa. 26, 218 A.2d 336, 337 (1966) (upholding demurrer in tort action based on remoteness); *Fairbanks v. Kerr*, 70 Pa. 86 (1872); *Matos v. Rivera*, 436 Pa.Super.

509, 648 A.2d 337 (1994) (affirming dismissal of negligent entrustment claim on remoteness grounds). A challenge to the existence of proximate cause is appropriate for disposition on the pleadings because it is a question of law. *See Matos*, 648 A.2d at 341; *Vattimo*, 465 A.2d at 1233. Generally, a plaintiff must allege that the defendant's negligence was the legal cause, i.e., the proximate cause, of his or her injuries. *See id.* As an initial matter, proximate cause is a factual matter to determine whether the defendant's conduct played a substantial factor in the plaintiff's injury. *See id.* However, policy considerations may limit liability as a matter of law, even if a defendant's conduct was a substantial factor in producing the plaintiff's injury. *See Matos*, 648 A.2d at 341; *Vattimo*, 465 A.2d at 1233, 1236 (citing Prosser and Keeton on Torts § 42 (4th ed.); disallowing recovery for damages because of policy considerations). One such policy limitation, remoteness, remains a question of law for the court. *See Liney*, 218 A.2d at 337; *Brown v. Philadelphia College of Osteopathic Med.*, 760 A.2d 863, 868–69 (2000); *see also Assoc. Gen. Contractors v. California State Council of Carpenters*, 459 U.S. 519, 532–33, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983) (describing directness of injury as a judicially imposed limitation on tort recovery).

**1.  The six-factor test**

The Third Circuit recently pronounced a six factor test to analyze remoteness for RICO and antitrust claims. *See Allegheny Gen. Hosp.*, 228 F.3d at 438–442; *Steamfitters*, 171 F.3d at 925–31.[15] The court

---

**14.** Ostensibly, proximate cause would also limit the plaintiffs' recovery on their public nuisance claim, even if the question would not be one of law for the court. *See Fairbanks v. Kerr*, 70 Pa. 86 (1872) (requiring submission to jury of proximate cause element for public nuisance claim); *Allegheny v. Zimmerman*, 95 Pa. 287 (1880). Federal courts have also required causation in public nuisance suits. *See Pottstown Indust. Complex v. P.T.I. Servs.*, No. 91–5660, 1992 WL 50084, at *7 (E.D.Pa.1992) (interpreting *Philadelphia Elec. Co. v. Hercules, Inc.*, 762 F.2d

303, 316 (3d Cir.1985) to require the nuisance cause plaintiff's injury). However, the Third Circuit recently commented that "public nuisance ... do[es] not require proximate cause." *Allegheny Gen. Hosp. v. Philip Morris, Inc.*, 228 F.3d 429, 446 (3d Cir.2000). As the Third Circuit has recently spoken on this issue in *Allegheny General Hospital*, the court will not revisit it here.

**15.** The Third Circuit also conducted remoteness inquiry under *Blue Shield of Virginia v. McCready*, 457 U.S. 465, 102 S.Ct. 2540, 73

then dismissed negligence claims for lack of proximate cause, resting on its remoteness analysis under RICO and antitrust law. *See Steamfitters,* 171 F.3d at 937, 937 n. 23; *see also Allegheny Gen. Hosp.,* 228 F.3d at 445 (applying remoteness analysis to state common law claims with proximate cause element). Just as the negligence claim in *Steamfitters,* the negligence claims raised in the instant case also raise complex causation problems of economic harm to a remote plaintiff. Accordingly, the antitrust/RICO proximate cause analysis provides a useful analytical tool.

■ As adapted to negligence law, the six remoteness factors are: (a) the causal connection between the defendant's wrongdoing and plaintiff's harm; (b) the specific intent of defendant to harm plaintiff; (c) the nature of plaintiff's alleged injury, and whether it relates to the purposes of tort law; (d) whether the claim for damages is highly speculative; (e) the directness or indirectness of the alleged injury; and (f) keeping the scope of complex trials within judicially manageable limits—that is—avoiding the risks of duplicate recoveries on the one hand and the danger of complex apportionment on the other. See *Assoc. Gen. Contractors,* 459 U.S. at 537–38, 103 S.Ct. 897; *Steamfitters,* 171 F.3d at 924; *Allegheny Gen. Hosp.,* 228 F.3d at 438. In addition, a governmental entity may be too remote to sue if it lacks political power under state law. *See Allegheny Gen. Hosp.,* 228 F.3d at 436; *Steamfitters,* 171 F.3d at 934.

### a. Causal connection

According to the plaintiffs' complaint, the route a gun takes from the manufacturer's control to the streets of Philadelphia is long and tortuous, passing through several hands en route. First, the manufacturer ships the weapon to a federal firearm licensee. Second, the federal fire-

arm licensee must sell it to a lawful purchaser acting as a "straw buyer." Then, the straw buyer must transfer the weapon to a criminal. Third, the transferee must use it to commit a crime, or to a youth who injures himself or a companion. Fourth, that person must be injured or reasonably threatened. Lastly, that person increases demand on the plaintiffs' resources. Only a distant and infirm causal relationship exists between the gun industry's distribution practices and the plaintiffs' injuries. *See Allegheny Gen. Hosp.,* 228 F.3d at 439.

### b. Specific intent to harm

The plaintiffs have not contended that the gun manufacturers *intend* to inflict injury upon the citizens of Philadelphia or to augment institutional costs. At most, the plaintiffs allege the gun manufacturers are *aware* that their weapons might fall into hands where they may be misused. This weighs against a finding of proximate cause.[16]

### c. Nature of the plaintiffs' injuries and purposes of tort law

Tort law aims to strike a delicate balance between compensating plaintiffs and ensuring ongoing economic stability. *City of Philadelphia v. Lead Indust. Ass'n,* 994 F.2d 112, 126 (3d Cir.1993). The tension is not easily resolved:

As it is with everything, a balance must be struck—certain limits drawn. We are, in the end, dealing with money, and that money must come from somewhere—from someone: the public pays for the very most part by increased insurance premiums, taxation, prices paid for consumer goods, medical services, and in loss of jobs when the manufacturing industry is too adversely affected. A sound and viable tort system—generally what we now have—is a

L.Ed.2d 149 (1982), which is inapposite in this case. *See Camden County Bd. of Chosen Freeholders v. Beretta U.S.A. Corp.,* 123 F.Supp.2d 245, 257–58 (D.N.J.2000).

**16.** Even if specific intent were not a factor for proximate cause analysis in negligence claims, the other five factors strongly weigh against a finding of proximate cause.

valuable incident of our free society, but we must protect it from excess lest it becomes unworkable and alas, we find it replaced with something far less desirable.

*Id.* at 126. (quoting *Mazzagatti v. Everingham*, 512 Pa. 266, 516 A.2d 672, 679 (1986) (Flaherty, J. concurring)). Here, both Congress and the legislature have struck a balance by devising a carefully calibrated set of regulations to govern the gun industry. *See supra* at 888. These bodies of government have made the determination that it suffices that there are restrictions on who may purchase guns, combined with rigorous law enforcement and severe penalties to prevent the sale of guns to others forbidden by law to possess them.

### d. Directness or indirectness of injury

This factor strongly militates against the imposition of any duty on the gun industry. Consideration of this element comprises two inquiries: (1) whether there is a more appropriate party; and (2) remoteness. *See Allegheny Gen. Hosp.*, 228 F.3d at 440.

As to the first concept, where there is a more appropriate party, that is, a more directly injured party, the tolerance for indirect victims is lessened. *See id.* at 440. As the Supreme Court said in the context of antitrust law, "The existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement diminishes the justification for allowing a more remote party such as [the plaintiff] to perform the office of private attorney general." *Assoc. Gen. Contractors,* 459 U.S. at 542, 103 S.Ct. 897; *Steamfitters,* 171 F.3d at 927; *Allegheny Gen. Hosp.,* 228 F.3d at 440.

The public interest would not be harmed by precluding the instant suit. Gunshot victims here would undoubtedly have a high degree of interest in pursuing any claim against the gun manufacturer. Gunshot wounds inflict serious physical and economic hardships, and individuals will seek to recoup those costs from responsible defendants. The direct plaintiffs here would have more of an interest in pursuing individual claims than the patients treated for tobacco related illnesses in *Allegheny General Hospital.* The hospitals had already treated those patients at no cost, and consequently had no interest in pursuing a suit to recover medical expenses. *See id.* at 440.

The presence of an individual plaintiff also aids apportionment of fault where a gun is discharged. As one court has noted, in the context of municipal lawsuits against the gun industry, for each individual injury, "independent factors obviously come into play, such as criminal conduct, drug or alcohol abuse, or other misconduct by the owner." *City of Cincinnati v. Beretta U.S.A. Corp.,* Nos. C–990729, 2000 WL 1133078, at *8 (Ohio Ct.App. Aug. 11, 2000). Thus, to the extent the plaintiffs here seek to subrogate themselves to the claims of gunshot wound victims and other more immediately harmed by gun violence, they also would preclude potential defenses the gun manufacturers might have were each case adjudicated on an individual basis. *See Int'l Bhd. of Teamsters,* 196 F.3d at 820 (claiming that a suit by derivative plaintiff would seeks to avoid traditional requirement in subrogation action that defendant lack defenses such as contributory negligence).

### e. Speculative nature of damages

The plaintiff's claims also would not provide a reasonable approximation of damages, implicating the fifth factor of remoteness analysis. *See Steamfitters,* 171 F.3d 912 (finding claim would be speculative because plaintiff would need to demonstrate how many plaintiffs would have avoided harmful effects of cigarettes had industry not used their marketing campaign). It would be difficult, if not impossible, to calculate how many incidents involving guns could have been avoided had the gun industry adopted different policies.

#### f. Avoid duplicate recovery and complex apportionment of damages

The Third Circuit has twice avoided analyzing remoteness under this prong because of uncertainties involving how Pennsylvania's collateral source rule would impact on a complex apportionment scheme as would be required for the instant action. *See Allegheny Gen. Hosp.*, 228 F.3d at 442; *Steamfitters*, 171 F.3d at 928 n. 9. This court will follow the Circuit's lead.

However, as an analysis of the other five prongs show, the plaintiffs' claims are too speculative and remote to permit them to recover: (1) there is only a weak causal connection between the gun manufacturers' conduct and the plaintiffs' injuries, (2) the gun manufacturers do not intend to harm any of the plaintiffs, (3) tort law would seem to prefer a more balanced approach to recovery, (4) the plaintiffs' claims are entirely derivative of others who would be more appropriate plaintiffs, and (5) the damages which the plaintiffs seek are far too speculative.

#### 2. Governmental standing

■ The City cannot avoid the consequences of the remoteness doctrine by suing in its "governmental capacity." *See, e.g.* Cmplt. at ¶ 2. Bald claims to the parens patriae power do not mean it is available. As the court in *Steamfitters* notes, the state Attorneys General pursued their claims against the tobacco industry based on either specific statutes giving the Attorney General the right to sue on behalf of the state or the states' political power exemplified by the ability to pass legislation. *See Steamfitters*, 171 F.3d at 934, n. 18. The city has pointed to no statute allowing it to recover for the effects of gun violence to its citizens.[17] And as to the latter authority, the Pennsylvania legislature has already preempted the city's ability to pass ordinances regulating the gun industry. *See Ortiz v. Commonwealth*, 545 Pa. 279, 681 A.2d 152 (1996).

In light of the foregoing, the plaintiffs could not demonstrate that they were owed a duty or that they could prove proximate cause at trial. Therefore, the plaintiffs' negligence claims must fail. *Accord Penelas v. Arms Tech., Inc.*, No. 99–1941 CA–06, 1999 WL 1204353, *1–2 (Fla. Cir.Ct. Dec. 13, 1999); *Ganim v. Smith & Wesson Corp.*, No. CV 990153198S, 1999 WL 1241909, at *4 (Conn.Super.Ct. Dec. 10, 1999).

### V. The Plaintiffs Have Failed to State a Claim Grounded In Public Nuisance.

■ I am again faced with a question of first impression: does Pennsylvania law recognize a public nuisance tort for distribution practices of a legal, non-defective product which causes harm to individuals after the product has left the defendant manufacturer's control? Plaintiffs have not been able to point to any Pennsylvania case explicitly or implicitly adopting their theory. The defendants have not cited a Pennsylvania case discounting such a public nuisance claim. In such a situation, federal courts should proceed cautiously. *Cf. Todd v. Societe Bic, S.A.*, 21 F.3d 1402, 1412 (7th Cir.1994) (choosing to restrict liability rather than expand it where state law is uncertain). The Second Circuit recently confronted the same dilemma when it needed to confront issues of gun manufacturer liability under New York negligence law. *Hamilton v. Beretta U.S.A. Corp.*, 222 F.3d 36 (2nd Cir.2000). That court chose a path unavailable to me: it certified the question to the New York Court of Appeals. *See id.* at 46. If I must choose between an interpretation of Pennsylvania law which reasonably restricts liability, and another which expands it, prudence dictates I choose the narrower path.

---

**17.** In contrast, the complaint in the Commonwealth's recent suit against the tobacco industry identified several statutes permitting the Attorney General to sue on behalf of Pennsylvania. *See Commonwealth v. Phillip Morris, Inc.*, 736 A.2d 693, 693–94 (Pa. Commw.Ct.1999) (Kelley, J. dissenting).

*See Todd,* 21 F.3d at 1412; *Bubalo v. Navegar, Inc.,* No. 96C3662, 1998 WL 142359, 1998 U.S. Dist. LEXIS 3598, at *14 (N.D.Ill.1998) ("Bubalo II") (reversing earlier decision in part and declining to find public nuisance liability against gun manufacturer for marketing scheme in case of first impression under Illinois law).

### A. Elements of a Public Nuisance Claim

▮▮▮ A public nuisance may be enjoined at the behest of a private citizen or group of citizens if their property or civil rights are specifically injured by the public nuisance over and above the injury suffered by the public generally. *See Pennsylvania Soc'y for Prevention of Cruelty to Animals v. Bravo Enters., Inc.,* 428 Pa. 350, 237 A.2d 342, 348 (1968); *Greyhound Lines, Inc. v. Peter Pan Bus Lines, Inc.,* 845 F.Supp. 295, 301 (E.D.Pa.1994) (Brody, J.) (citing RESTATEMENT (SECOND) 821C(1) (1979)); *In re One Meridian Plaza Fire Litig.,* 820 F.Supp. 1460, 1480 (E.D.Pa.1993), *rev'd on other grounds sub nom. Federal Ins. Co. v. Richard I. Rubin and Co., Inc.,* 12 F.3d 1270 (3d Cir.1993). Alternatively, a plaintiff may have standing as the representative of a state or political subdivision. RESTATEMENT (SECOND) § 821(C) (1979). *But see supra* section I.C.1.b (holding that political subdivisions may not bring public nuisance action where state has reclaimed authority).

To define the law of public nuisance, Pennsylvania has adopted the approach taken by the Restatement of Torts:

(1) A public nuisance is an unreasonable interference with a right common to the general public.

(2) Circumstances that may sustain a holding that an interference with a public right is unreasonable include the following:

(a) Whether the conduct involves a significant interference with the public health, the public safety, the public peace, the public comfort or the public convenience;

(b) whether the conduct is proscribed by a statute, ordinance or administrative regulation, or

(c) whether the conduct is of a continuing nature or has produced a permanent or long-lasting effect, and, as the actor knows or has reason to know, has a significant effect upon the public right.

*Muehlieb v. City of Philadelphia,* 133 Pa. Cmwlth. 133, 574 A.2d 1208, 1211 (1990) (quoting RESTATEMENT (SECOND) OF TORTS § 821B (1979); *Greyhound Lines, Inc.,* 845 F.Supp. at 301).

Originally, nuisance served two functions. First, it provided a remedy for interference with the use or enjoyment of land. W. PAGE KEETON, PROSSER AND KEETON ON THE LAW OF TORTS § 86 (5th ed. 1984) ("Prosser and Keeton"). Second, it served a basis for the prosecution of those who infringed on the rights of the crown or the rights of the general public. *See id.;* RESTATEMENT (SECOND) OF TORTS § 821B cmt. a (1979). The leading examples of such royal or common rights were purprestures—encroachments upon the royal domain or the public highway. *See id.* By the time Edward III sat on Britain's throne, the principle had expanded to include a number of invasions of the rights of the public, represented by the Crown. *See id.;* Prosser and Keeton at § 86. Public nuisance was defined as an act "which obstructs or causes inconvenience or damage to the public in the exercise of rights common to all Her Majesty's subjects." *Id.* at § 90.

The Pennsylvania Supreme Court has explained that nuisance is the use of property or a course of conduct which transgresses the just restrictions upon use or conduct which the proximity of other persons or property in civilized communities imposes upon what would otherwise be rightful freedom. *See Kramer v. Pittsburgh Coal Co.,* 341 Pa. 379, 19 A.2d 362, 363 (1941). Nuisances are those wrongs which arise from the "unreasonable, un-

warrantable, or unlawful use" of one's real or personal property. *Id.* In addition, one's "improper, indecent, or unlawful personal conduct" which obstructs the right of the public such that it produces material harm that the law presume a consequent damage. *Id.*

Pennsylvania courts have found all of the following may constitute a public nuisance: the drainage of acid from an abandoned mineshaft into a nearby waterway, *see Commonwealth v. Barnes and Tucker,* 455 Pa. 392, 319 A.2d 871 (1974); the manufacture of fireworks in a populated area, *McDade v. City of Chester,* 117 Pa. 414, 12 A. 421 (1888); sexual conduct occurring on a premises which could lead to the spread of the human immunodeficiency virus (HIV), *see Commonwealth ex rel. Preate v. Danny's New Adam & Eve Bookstore,* 155 Pa.Cmwlth. 281, 625 A.2d 119 (1993); and the keeping of twenty purebred huskies on a residential street, *see Muehlieb v. City of Philadelphia,* 133 Pa.Cmwlth. 133, 574 A.2d 1208 (1990).

### B. Limitations on Public Nuisance Law

**1. Restricted interpretations of 'unreasonable interference with public rights'**

Federal district courts interpreting Pennsylvania public nuisance law have not treated the tort as unbounded. *See Greyhound Lines, Inc.,* 845 F.Supp. at 302. Greyhound Lines alleged that employees of its competitor, Peter Pan, had impeded the entrance to Greyhound's Philadelphia terminal and shouted at Greyhound passengers. *See id.* at 299. Greyhound contended that their conduct constituted a public nuisance. The court disagreed, finding only those individuals who use the terminal were harmed rather than the

public at large. Therefore, no public right was affected. *See id.* at 302. Judge Brody continued:

I also do not find, and the plaintiff has not suggested, that the hawker's conduct—whether characterized as aggressive marketing or picketing—constitutes a public nuisance. I am obligated in deciding Pennsylvania public nuisance law to determine what the state Supreme Court would decide if faced with these facts. I find no reason, and plaintiff has offered none, to suggest that the Pennsylvania Supreme Court would extend the scope of the public nuisance tort to this type of activity.

*Id.* The only federal district court cases to which plaintiffs cite apply Pennsylvania public nuisance law in traditional contexts. In *In re One Meridian Plaza Fire Litigation,* the court found a public nuisance well within the traditional ambit of public nuisance law—an obstruction of the public way and concomitant access to individual businesses and properties. *In re One Meridian Plaza,* 820 F.Supp. at 1480 (citing RESTATEMENT (SECOND) OF TORTS § 821C cmts. f, h (1979)). Another district court went no further in *Pottstown Indust. Complex v. P.T.I. Servs.,* No. 91–5660, 1992 WL 50084 (E.D.Pa.1992). The *Pottstown* court explicitly relied on a Pennsylvania statute which made the release of hazardous substances a public nuisance. *See id.* at *7.[18]

Plaintiffs have cited to no decision of the Pennsylvania Supreme Court, or other Pennsylvania courts, which allow recovery on a public nuisance basis for the distribution of a legal product. The cases which the plaintiffs cite are readily distinguishable. In *Barnes and Tucker,* where acid drained from defendant's abandoned mine into a waterway, the Pennsylvania Supreme Court found a public right to water

---

**18.** At oral argument, plaintiffs pointed to the Third Circuit's recent decision for implicit recognition that the design and marketing of a product—tobacco—could constitute a public nuisance. *See Allegheny Gen. Hosp. v. Philip Morris, Inc.,* 228 F.3d 429, 446 (3d Cir.2000).

The Third Circuit held nothing of the kind, and it did not even discuss the issue. *See id.* at 446. Rather, it precluded recovery by declining to find the plaintiff hospitals has suffered harm different from that of other members of society. *See id.*

without mine drainage pollutants protected by the Pennsylvania Constitution, which explicitly established the Commonwealth as the trustee of those resources for the people. *See Commonwealth v. Barnes and Tucker*, 319 A.2d at 882 (citing PA. CONST. art. I § 27). Idyllic and desirable though it may be, there is no similar right to be free from guns and violence. Moreover, the decision in Barnes and Tucker was at least guided by a statute which controlled mine discharges. *See Barnes and Tucker*, 319 A.2d at 883.

Plaintiff's other cases are of little use because they involve either traditional land-based nuisances or violations of ordinances. *Anderson v. City of Philadelphia*, 380 Pa. 528, 112 A.2d 92 (1955) involved a minor who alleged he was beaten by fellow inmates at a home for juvenile delinquents. A taproom and its noisy and boisterous patrons were deemed to pose a nuisance to its quiet residential neighbors in *Reid v. Brodsky*, 397 Pa. 463, 156 A.2d 334 (1959), a classic case of interference with the use and enjoyment of land. The court in *Groff v. Sellersville*, 12 Pa.Cmwlth. 315, 314 A.2d 328, 330 (1974) relied on an ordinance permitting it to remove the defendant's dilapidated building as a "dangerous structure." *Id.*

In addition to pointing to case law, the plaintiffs urged this court at oral argument to "follow" the expansive reach of public nuisance law ascribed to it by Professors Prosser and Keeton. Trans. Oral Arg. at 69–70. Counsel's argument suffers from (at least) two defects. First, the Professors viewed the amorphous expansion of public nuisance as an alarming development, not a welcome one. They bemoaned, "There is perhaps no more impenetrable jungle in the entire law than that which surrounds the word 'nuisance.' It has meant all things to all people, and has been applied indiscriminately to everything from an alarming advertisement to a cockroach baked in a pie." Prosser and Keeton § 86. In fact, they encourage the dismissal "of a considerable number of cases which have applied the term [nuisance] to matters not connected either with land or with any public right, as mere aberration, adding to the vagueness of an already uncertain word." Prosser and Keeton § 86 at 618. Second, since the last edition of their treatise in 1985, courts across the nation have begun to refine the types of cases amenable to a nuisance theory.

### 2. Nuisance is inapplicable to suits based on the design and distribution of products

One way in which the role of public nuisance law has been restricted is the refusal to apply the tort in the context of injuries caused by defective product design and distribution. Surely if defective products cannot constitute a public nuisance, then products which function properly do not constitute a public nuisance.

In *Tioga Public School District v. U.S. Gypsum Co.*, the Eighth Circuit found a public nuisance charge was improperly given to the jury where defendant's product has been installed in the plaintiff's school. *Tioga Public Sch. Dist. v. U.S. Gypsum Co.*, 984 F.2d 915, 920 (8th Cir.1993). The court noted the sheer absence of North Dakota precedent extending public nuisance law to product liability. *See id.* The Circuit Court continued:

> [T]o interpret the nuisance statute in the manner espoused by [the plaintiff] Tioga would in effect totally rewrite North Dakota tort law. Under Tioga's theory, any injury suffered in North Dakota would give rise to a cause of action under section 43–02–01 regardless of the defendant's degree of culpability or of the availability of other traditional tort law theories of recovery. *Nuisance thus would become a monster that would devour in one gulp the entire law of tort.*

*Tioga Public Sch. Dist.*, 984 F.2d 915, 921 (8th Cir.1993) (emphasis added). One Michigan appellate court opined:

The remoteness of any possibility that a product which has caused injury is legally classifiable as a nuisance for the injurious effects of which the manufacturer or seller may be held liable is apparent. For one thing, the idea of a wrongful use of property (as distinguished from an improper condition of property) is basic to the legal concept of nuisance. For another thing, the role of the "creator" of a nuisance, upon whom liability for nuisance-caused injury is imposed, is one to which manufacturers and sellers seem totally alien [63 Am.Jur.2d, *Products Liability,* § 593].
We agree and hold that manufacturers, sellers, or installers of defective products may not be held liable on a nuisance theory for injuries caused by the defect. To hold otherwise would significantly expand, with unpredictable consequences, the remedies already available to persons injured by products, and not merely asbestos products.

*Detroit Bd. of Educ. v. Celotex Corp.,* 196 Mich.App. 694, 493 N.W.2d 513, 521 (1992) (emphasis added); *see also City of San Diego v. U.S. Gypsum Co.,* 30 Cal.App.4th 575, 35 Cal.Rptr.2d 876, 882–83 (1994) (refusing to apply nuisance theory in asbestos case). *Accord City of Bloomington v. Westinghouse Elec. Corp.,* 891 F.2d 611, 614 (7th Cir.1989) (finding defendant manufacturer's lack of control over a sold chemical when it entered the environment precluded public nuisance liability).

The only appellate court to consider such a claim by a municipality against the gun industry refused to apply public nuisance law. *See City of Cincinnati v. Beretta U.S.A. Corp.,* No. C–990729, 2000 WL 1133078, at *9–10 (Ohio Ct.App. Aug. 11, 2000).[19] A Florida trial court agreed. *See Penelas v. Arms Tech., Inc.,* No. 99–1941 CA–06, 1999 WL 1204353, at *4 (Fla.

Cir.Ct. Dec. 13, 1999). *But see City of Boston v. Smith & Wesson,* No.1999–02590, 2000 WL 1473568 (Mass.Super.Ct. filed July 13, 2000) (slip op.) (refusing to dismiss public nuisance claim at pleadings stage); *Archer v. Arms Tech.,* No. 99–912662–NZ (Mich.Cir.Ct. filed May 16, 2000) (slip op.) (same). The *City of Boston* court described the plaintiff city's legal theory as "unique in the Commonwealth [of Massachusetts]," then reasoned, "but that is not reason to dismiss at this stage of the proceedings." *Id.* at *14. However, the lack of precedent implies the lack of a legal theory affording a plaintiff a right to relief, and is the very reason to dismiss this theory here. *See* Fed.R.Civ.P. 12(b)(6) (requiring dismissal where complaint fails to allege a claim for which relief can be granted).

The refusal of many courts to expand public nuisance law to the manufacturing, marketing, and distribution of products conforms with the elements of public nuisance law. In the present suit, the injurious acts with their harmful consequences are not created by the manufacturers, but by criminals and others unlawfully in possession of firearms. Gun manufacturers do not wrongfully "use" their products; in fact, their products are legal. They assemble constituent parts and ship them out. They purchase advertisements. Thus, their distribution practices cannot be said to be an "unreasonable, unwarrantable, or unlawful use," *Kramer,* 19 A.2d at 363, of their personal property which is elemental to a finding of nuisance.

Furthermore, as in most products liability actions, the defendants are no longer in control of the instrument of the nuisance, further attenuating the application of nuisance doctrine to products. *See Detroit Bd. of Educ.,* 493 N.W.2d at 521–22. In

**19.** One U.S. district court in Ohio deferred dismissal of a public nuisance claim brought by the City of Cleveland against the gun industry, finding the issue turned on whether or not the defendants had been negligent. · *See White v. Smith & Wesson, Corp.,* 97 F.Supp.2d 816, 829 (N.D.Ohio 2000). The federal district court issued its opinion on March 14, 2000, and did not have the benefit of the guidance of the interpretation of the Court of Appeals of Ohio regarding its state's law.

each of the Pennsylvania public nuisance cases discussed above, the defendants controlled the source of the nuisance, whether a mine with acid drainage, *Barnes and Tucker*, 319 A.2d at 871–73, ownership of the fireworks, *McDade*, 12 A. at 421–22, ownership and possession of dogs on a residential street, *Muehlieb*, 574 A.2d at 1209, or a dilapidated building. *Groff*, 314 A.2d at 329–30.

The plaintiffs urge the court not to follow those cases requiring control over the nuisance at the time the injury occurs. They insist that the nuisance is the distribution practice itself. However, doing so would run contrary to notions of fair play. The defendants have a diminished ability to dictate precisely to whom their products will be sold once they ship them to legally licensed distributors and dealers. More importantly, they lack direct control over how end-purchasers use (or misuse) weapons.

The plaintiffs try to rely on *Bloomington* to support their notion that a manufacturer must ensure that purchasers and distributors do not misuse or illegally sell their products. *See Bloomington*, 891 F.2d at 614. In *Bloomington*, Monsanto, a chemical manufacturer, sold its products to a plant which then allowed them to enter a waterway. *See id.* The Seventh Circuit found that Monsanto had not created a public nuisance. *See id.* The plaintiffs seek to emphasize that the Monsanto had taken a number of steps to prevent the release of chemicals into the environment. But the holding in *Bloomington* is not so limited. The court found it telling that the plaintiff, the City of Bloomington, could not point to any case "holding manufacturers liable for public or private nuisance claims arising from the use of their product subsequent to the point of sale." *Id.* While Monsanto certainly took a number of laudable steps to prevent the potential entry of its chemicals into the environment, those steps are by no means required.

In short, the defendants' actions do not constitute a nuisance under any recognized theory in Pennsylvania. To the contrary, appellate courts have refrained from applying public nuisance doctrine in cases where the instrument of the nuisance is a lawfully sold product which has left the manufacturer's control. This claim is nothing more than a clever, but transparent attempt at an end run around the legislature's statutory prerogatives. Therefore, plaintiffs' claim for public nuisance must fail.

### CONCLUSION

Plaintiffs have advanced a novel approach to an old theory by targeting the gun manufacturers. Unfortunately, this was a theory in search of a case, and the defendants are out of range. Therefore, I am dismissing all of plaintiffs' claims against the defendant gun manufacturers.